408 So.2d 861 (1980)
STATE of Louisiana
v.
Edmond E. TALBOT, III.
No. 62832.
Supreme Court of Louisiana.
January 28, 1980.
On Rehearing December 14, 1981.
*862 F. Irvin Dymond, Dymond, Crull & Castaing, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Patrick G. Quinlan, Asst. Attys. Gen., for plaintiff-appellee.
Joseph H. Simpson, Amite, for amicus curiae on behalf of the State.
CALOGERO, Justice.[*]
Defendant Edmond E. Talbot, III was charged by grand jury indictment with the crimes of attempted aggravated rape, attempted aggravated crime against nature, aggravated burglary and armed robbery. On December 12, 1977 he was tried before a twelve person jury which unanimously found him guilty as charged on each offense. The defendant was sentenced as a habitual offender to serve sentences totalling one hundred fifty-six and one-half years at hard labor.[1] The defendant now appeals on the basis of twenty-one assignments of error which comprise ten arguments.
The essential context facts of the offense are not in dispute. The only issue in contest at the trial was the identity of the perpetrator. On the morning of July 25, 1977, a thirty year old registered nurse and housewife, the victim of these crimes, and her husband (who will be referred to throughout this opinion by the pseudonyms Mrs. Smith and Mr. Smith) observed a stranger near their residence. The stranger was observed talking with Mr. D. A. Cole, who resides nearby. A short while later as he left his residence near Hammond Mr. Smith encountered the stranger and had a brief conversation with him.
After Mr. Smith departed the stranger went to the residence, ostensibly to seek directions to another address in order to deliver supplies. He spoke with Mrs. Smith a short while and then left. Shortly thereafter, Mrs. Arnetta Griffin, the family domestic, *863 arrived and entered the house. The stranger then returned to the residence and asked Mrs. Griffin if he could use the telephone. Shortly after being given the telephone for use outside he pushed his way into the residence and brandished a pistol stating, "This is a robbery." The perpetrator locked Mrs. Griffin in a bedroom closet and forced Mrs. Smith to disrobe at gunpoint. He battered the victim and attempted to rape her but could not maintain an erection. He attempted to force the victim to perform sex but was unsuccessful and finally concluded his assault by masturbating on the victim. The assailant then locked the victim in the closet with Mrs. Griffin and fled in the Smith's automobile. Several items of jewelry were taken by the perpetrator. The Smith's automobile was found a short distance from the residence.
A composite picture of the offender was constructed through interviews with the witnesses. On August 1, 1977 Detective Dykes of the Tangipahoa Parish Sheriff's Office discovered that a subject resembling the composite picture was working at a shopping center in Hammond, La. The detective arranged for Mr. Cole, who shortly before had spoken with the stranger who later attacked Mrs. Smith, to come to a clothing store in Hammond, La. (where the defendant was employed). Cole entered the store, spoke briefly with the defendant and upon regrouping with the officers identified him as the same person he had observed on the day of the offense. The following day the victim and her husband identified the defendant in a lineup conducted by the Sheriff's office. A third person, Mr. Harold Gomez, who had seen a man resembling the suspect near the Smith's home shortly before the crime occurred was unable to make a positive identification at the lineup. When Gomez left the room where the lineup was conducted he told Detective Dykes that if he had had to pick someone out of the lineup, it would have been number five (defendant's number at the lineup). Neither Mr. Cole nor Mr. Smith's domestic, Mrs. Griffin, viewed defendant in this or any other police conducted lineup. Both Mr. Cole and Mrs. Griffin as well as Mr. and Mrs. Smith positively identified defendant at trial.

ARGUMENT NO. I
(Assignments of Error Nos. 1, 2, 3 and 5)
By these assignments the defendant challenges several rulings of the trial court in the motion to suppress the pretrial identification by Mr. Cole, Mr. Smith and Mrs. Smith. He asserts in assignments one and two that the defense should have been allowed to call the victim and her husband during the motion to suppress in an attempt to prove that their in-court identification was the fruit of a prior unconstitutional identification made by Cole. The trial court ruled that such testimony was beyond the motion to suppress and also denied defendant's request to call the witnesses for the restricted purpose of making a tender of the evidence for appellate purposes. In assignments three and five defendant argues that the in-court identification of defendant by Cole was the product of an unconstitutional one-on-one confrontation. He claims that the trial court erred in denying the motion to suppress this evidence and improperly allowed the admission of the Smiths' pre-trial and in-court identification and Cole's identification at trial.
The identification of the defendant by Mr. Cole occurred on August 1, 1977. Sheriff's officers asked Cole to meet them at a shopping center in Hammond, La. Upon arriving at the Hammond Square shopping center Cole was met by Officer Dykes and was asked to enter the Tops and Trousers shop to see if he recognized anyone. Cole indicated that as he entered the shop the only person he saw was the defendant, whom he positively identified as the man he had observed and spoken to near the Smiths' residence on July 25, 1977 immediately prior to the crime. The defendant claims that the identification was unnecessarily suggestive, resulted in an unconstitutional arrest, and that the one-on-one confrontation tainted Cole's in-court identification. He asserts further that the subsequent lineup identification by Mr. and Mrs.
*864 Smith was a direct result of the improper arrest and was tainted by the impermissibly suggestive identification of defendant by Cole.
The defendant has the burden of establishing that pre-trial identification procedures are impermissibly tainted. La.C.Cr.P. art. 703. In considering the validity of in-field identification this Court considers the totality of circumstances to determine if it is fairly conducted or unduly suggestive. State v. Bland, 310 So.2d 622 (La.1975); State v. Lee, 340 So.2d 1339 (La.1976). One-on-one confrontations have usually been upheld only when they are closely associated in time with the criminal transaction. State v. Collins, 350 So.2d 590 (La. 1977); State v. Maduell, 326 So.2d 820 (La. 1976).
Typically a suspect apprehended shortly following a crime is returned to the scene and, accompanied by the apprehending officers, is presented to the victim. Such prompt identifications are held permissible on the rationale that they promote fairness by supporting reliability of the identification (the identification is fresh in the witness' mind) and/or the expeditious release of innocent suspects.
In this case the identification by Cole did not take place immediately after perpetration of the crime but rather a week later. On the other hand defendant was not in custody at the time. And it is significant that the investigating officers, according to their testimony, were unaware that defendant had been questioned in the case by other officers on the day of the offense. The officers who arranged for Cole's identification suspected defendant only because he resembled the composite drawing of the assailant. Thus while the identification was not closely associated in time with the offense, it did occur as soon as defendant was suspected by the officers and it was apparently accomplished in order to avoid the possibility of an arrest of an innocent suspect, in fact a suspect who, because of the absence of probable cause to arrest, was not a likely prospect for placing in a police lineup.
Nor was the identification procedure conducted in an unfair manner. A few days prior to his identification of the defendant, Cole was shown a composite drawing of the suspect. Despite a prior inconsistency in his testimony, Mr. Cole indicated at trial that he was not shown the drawing immediately prior to his identification of the defendant at the shopping center.
And while Cole testified he saw and spoke briefly with only one man in the store, the defendant, the officers testified that shortly before Cole's entry into the store they had observed five or six males in the store. Nor did the officers point defendant out or tell Cole anything to indicate that defendant had committed the crime. Under the circumstances we conclude that there was no suggestiveness or patent unfairness such as would under these circumstances require that we hold the identification impermissibly tainted. See Bratten v. Delaware, 307 F.Supp. 643 (D.C.1969).
Inasmuch as we find no taint in the Cole identification defendant's first two assignments cannot prevail. Defendant's arrest on the heels of Cole's identification was valid and thus did not taint the subsequent lineup and in-court identification by Mr. and Mrs. Smith.[2] And since there is no claim that the subsequent lineup identification when defendant was in custody contained any procedural improprieties, we can see no prejudice by defendant's inability to call the Smiths to testify at the motion to suppress the Cole identification. Likewise Cole's in-court identification is not adversely affected by his initial identification of *865 defendant. Assignments one, two, three and five are without merit.

ARGUMENT NO. II

(Assignment of Error No. 4)
The defendant argues that the trial court erred in allowing the state to ask Mrs. Smith if she realized that the defendant could receive between one hundred seventy-four and one hundred ninety-four years in prison on the basis of her identification. Defendant urges that the import of the question was to support the witness' credibility or to corroborate the positive nature of her identification. He asserts that the credibility of the witness had not been attacked and that the witness had already identified the defendant during the questioning by the state.
The fundamental rules of evidence provide that testimony which establishes the credibility of a witness is inadmissible until the credibility of that witness has been attacked. 4 J. Wigmore, Evidence, § 1104 (Chadbourn Rev. 1972); C. McCormick, Evidence, § 49 (Cleary Ed. 1972). This principle is codified in La.R.S. 15:484 which provides:
Before a witness has been sworn he can be neither corroborated nor impeached, nor is testimony to establish the credibility of a witness admissible until that credibility has been attacked.
In State v. Passman, 345 So.2d 874 (La. 1977), this Court recognized that it was improper to allow a witness during direct examination to corroborate his own identification of the defendant by testifying as to his good eyesight. However, in that case they found the corroboration did not constitute a substantial violation of a constitutional or statutory right and did not result in a probable miscarriage of justice. Recently, in State v. Rogers, et al., 375 So.2d 1304 (La.1979), this Court decided that a witness' testimony as to his own truthfulness did not warrant reversal.
In the instant case any prejudice to defendant does not represent a substantial violation of a statutory or constitutional right, especially where defense counsel in his opening statement had alluded to the fact that defendant could receive fifty years for one crime and ninety-nine years for another.[3] There is no merit to this assignment of error.

ARGUMENT NO. III

(Assignment of Error No. 6)
This assignment relates to an extraordinary procedure in which the defense, without objection by the state, was allowed to conduct an in-court lineup to test the identification of the defendant by a witness. In response to a defense motion for special in-court identification procedures, the trial court allowed the defendant to move to the second row of the spectator bench and sit in a group of four individuals that defendant had selected from the courtroom spectators. The witness, Mrs. Arnetta Griffin, was then brought into the courtroom. During direct examination by the state she was asked to identify the assailant and pointed the defendant out from the other persons in the spectator section.
During trial, prior to the identification, defense counsel advised the court that it objected on the grounds that the lineup was insufficient to comply with the defense request. The defense argued that it was unable to find a sufficient number of spectators who resembled the defendant. It was further noted that the witness had partially entered the courtroom prior to the lineup and may have observed the defendant sitting at the defense table. The defendant urges that the procedure did not serve the objective for which the defendant's request had been made.
*866 There is no statutory authority which either mandates or prohibits a court's ordering a lineup in this fashion at the defendant's request, in the interest of a fair trial. The procedure allowed by the trial court in the present case, however, is a commendable one in the interest of fairness and within the purview of La.C.Cr.P. art. 3 which grants authority to courts to adopt procedures not specified by statute.[4] While an accused has no constitutional or legal right to such an in-court lineup, the trial court has broad discretion in deciding whether to order one and in determining the manner which the identification will be conducted. State v. Boettcher, 338 So.2d 1356 (La. 1976); United States v. Satterfield, 572 F.2d 687 (9th Cir. 1978); United States v. Williams, 436 F.2d 1166 (9th Cir. 1970). In the present case the identification procedure was conducted at the request of the defendant. While the defendant complained that the lineup was not as objective as he desired, he chose to "[t]ake advantage of the opportunity [to conduct the lineup] that the Court has offered us." There is no merit to this assignment of error.

ARGUMENT NO. IV

(Assignment of Error No. 8)
The defendant moved for a mistrial when Mr. Smith, after being discharged as a witness, walked over to the counsel table occupied by the prosecutor and embraced his wife, in the presence of the jury. Defendant requested no admonition, reasoning that it would only serve to worsen the impact of the conduct. The trial court denied the motion for a mistrial, which defendant now assigns as reversible error.
Defendant argues that the conduct of the witness mandates a mistrial under the provisions of La.C.Cr.P. art. 775 which provides in relevant part:
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
He urges that the conduct was prejudicial and was also within the purview of La.C. Cr.P. art. 771(2) which states:
When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
It has been consistently held that when the conduct does not fall within the mandatory mistrial provisions of La.C.Cr.P. art. 770, the judge has the sound discretion to determine whether the activity or comment so prejudiced the defendant that he could not receive a fair trial. State v. Domangue, 350 So.2d 599 (La.1977); State v. Johnson, 333 So.2d 223 (La.1976).
In the present case the witness was dismissed from the witness stand and was permitted to sit at the counsel table with his wife, the victim of the crimes. The record indicated no more than that Mr. and Mrs. Smith embraced in the presence of the jury. The conduct was nonverbal and there is no indication that it was intended by the couple or the state as a means of unfairly prejudicing the jury against defendant. In State v. Domangue, supra, this Court found that a mistrial was not necessary when a rape victim's spouse began crying and was removed from the courtroom during closing arguments. See also State v. Jenkins, 338 So.2d 276 (La.1976); State v. Daniel, 378 So.2d 1361 (La.1979).
The trial judge did not err in finding that there was not such prejudicial conduct as to *867 make it impossible for defendant to obtain a fair trial (C.Cr.P. art. 775); nor did he abuse his discretion by declining to grant a mistrial as per the authority given him by La.C.Cr.P. art. 771(2).

ARGUMENT NO. V

(Assignment of Error No. 10)
By this assignment of error the defendant claims that the trial court erred when it allowed a state's witness to testify regarding certain statements made by the defendant. The testimony revealed that the defendant gave conflicting statements to investigating officers regarding the time that he had left a girlfriend's residence on the morning of the crime. He initially told the officers that he left the residence at sunrise, but later he indicated that he left at approximately 10:00 a.m. He objected to the testimony on the grounds that the state failed to properly comply with defendant's pre-trial request for discovery of such statements. In a pre-trial motion for discovery defense counsel requested information as to the existence and substance of any oral statements which the state intended to offer in evidence at the trial. The state responded as follows:
The defendant has made statements which he intends to be exculpatory but which may or may not be inculpatory but which the state is not in a position to know at the present time. As additional evidence becomes available, if the state feels that the statements are inculpatory, they will be given to defense counsel at a minimum of thirty days before the trial.
The defendant has made statements intended to be exculpatory which might be inculpatory in nature as to his actions on the morning of the crime, including such things as stating that he has visited a veterinarian with a pet crow, that he had spent the night in the home of a young girl who was in a trailer.
During a hearing on the motion for discovery the state agreed to amend Section 3 above as to the language "including such things as." The defendant asserts that the state never satisfactorily amended its answers to inform the defense of the inculpatory statements.[5] It is argued, therefore, that the statements made by defendant should not have been admissible.
The statutory basis for the information requested by defendant in his pre-trial motion is La.C.Cr.P. art. 716 which provides in part:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the substance of any oral statement which the state intends to offer in evidence made by the defendant, whether before or after arrest, in response to interrogation by any person then known to the defendant to be a law enforcement officer.
The defendant claims that the court erred in failing to impose the sanctions allowed in La.C.Cr.P. art. 729.5 which provides in relevant part:
If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal as may be appropriate.
*868 The state contends that defendant's statements were exculpatory and need not have been provided to the defense. The state's contention here is incorrect since the statute provides for the disclosure of any oral statements made by defendant to law enforcement officers which the state intends to use as evidence at the trial. Thus, the state apparently could have been subject to the sanctions of Article 729.5. However, Article 729.5 provides for sanctions which are to be applied in the discretion of the trial court. Since the trial court had the discretion to deny the defendant's request for a mistrial or admonition, a showing of prejudice by virtue of the court's adverse ruling is required before a reversal of the conviction would be in order. See State v. Kimble, 375 So.2d 924 (La.1979); State v. Qualls, 353 So.2d 978 (La.1977).
The testimony introduced into evidence was used to show that the defendant gave contradictory statements to the police concerning the exact time defendant left a friend's home on the morning of the crime. This evidence was damaging to the defense alibi. However, the defense was the first to bring inconsistent statements made by defendant and defendant's major alibi witness to the attention of the jury during its opening statements. Defense counsel further indicated during the opening statements that the alibi was not air-tight and that defense witnesses would testify that there were uncertainties as to the time and date of the alibi. Therefore, the evidence admitted did not prove so damaging to the defendant as to merit reversal.
In sum, the state apparently failed to properly provide the defense with the oral statement that it introduced at trial. However, the requested mistrial and admonition were not mandated by statute and the testimony was not sufficiently prejudicial to require reversal.
This assignment of error is without merit.

ARGUMENT NO. VI

(Assignments of Error Nos. 11 and 12)
The defendant claims that the trial court erred when it allowed two police officers to testify regarding statements made by Mr. Cole during a pre-trial identification of the defendant. The court overruled the defense hearsay objections. The state argues that the statements were properly admitted as corroboration of Mr. Cole's prior testimony.
The statutory provision for allowing the admission of prior similar statements to corroborate witness' testimony is La.R.S. 15:496:
When the testimony of a witness has been assailed as to a particular fact stated by him, similar prior statements, made at an unsuspicious time, may be received to corroborate his testimony.
In the present case the testimony at issue was used to corroborate the facts and circumstances of the pre-trial identification of defendant by Mr. Cole, which was previously referred to during cross-examination. Defense counsel had questioned Cole during cross-examination regarding the pre-trial identification. In brief the defense admits that it attacked the witness as to "[t]he correctness of his identification and the opportunity and circumstances under which he observed the perpetrator." The testimony was admissible as corroboration of the former identification testimony by Cole. This assignment of error lacks merit.

ARGUMENT NO. VII

(Assignments of Error Nos. 13, 14, 17 and 18)
The defendant argues in Assignment thirteen that the court erred in its in limine ruling that the state could cross-examine the defendant on the details of his previous convictions. Assignments fourteen and seventeen pertain to specific questions by the state regarding defendants prior convictions and probation. Assignment eighteen involves the prosecutor's statements during final argument regarding defendant's prior record.
The defendant initially argues that this Court should reconsider its decisions which allow a defendant to be cross-examined on *869 the details of his previous convictions. He contends that the court in deciding State v. Jackson, 307 So.2d 604 (La.1975) omitted from consideration the policy considerations that juries would treat such evidence as proof of the defendant's propensity to commit crime, resulting in convictions based on the defendant's character rather than this conduct.
Since the Jackson decision this Court has consistently held that a defendant testifying in his own behalf could be cross-examined regarding the details of his prior convictions. State v. Brown, 371 So.2d 746 (La.1979); State v. Sykes, 364 So.2d 1293 (La.1978); State v. Thompson, 364 So.2d 908 (La.1978); State v. Carter, 363 So.2d 893 (La.1978); State v. Dupar, 353 So.2d 272 (La.1977); State v. Elzie, 351 So.2d 1174 (La.1977); State v. Chenier, 343 So.2d 177 (La.1977); State v. Jackson, 339 So.2d 730 (La.1976); State v. Williams, 339 So.2d 728 (La.1976); State v. Elam, 312 So.2d 318 (La.1975). We have recognized defendant's argument regarding the possibility of prejudice from the details of prior convictions and have placed limits on the Jackson cross-examination. Accordingly, the extent to which an inquiry into prior convictions can be permitted depends upon the facts of the particular case. The trial court is given great discretion in determining the extent of the examination. State v. Brown, supra.
Under the jurisprudence the defendant's contention lacks merit. Furthermore, even were we to consider overruling Jackson and its progeny it is doubtful that we would find sufficient prejudice here to warrant reversing the conviction. Defendant's prior convictions and the details surrounding those offenses are relatively innocuous compared with the offenses with which he was here charged.
The defendant next argues that the prosecutor improperly attempted to influence the jury to regard the fact that defendant's prior criminal record as proof of his propensity to commit the offense for which he was charged. This assignment arose from the following line of questions:
Q. An arrest with possession with intent to distribute cocaine which can carry up to a thirty year sentence made an indelible impression on you, did it not?
A. Yes, it did.
Q. One that would cause you after that to behave yourself, right?
A. It would definitely make me not adventure into an escapade of that nature again.
Q. Of that particular nature?
A. Yes.
Q. But it would not stop you from going into escapades of a different nature, is that what you mean?
MR. KEMP: Judge, I am going to object. The only thing he can use this for is his credibility, and he is getting into an area thatexcuse me. Let me approach the bench."
The objection was overruled and the inquiry continued:
Q. I believeyour being placed on probation down thereI don't want to put words in your mouth, but that would stop you from committing a crime of that nature in the future, is that right?
A. Yes.
Q. That particular crime?
A. Yes."
As noted above, this Court has ruled that the state may cross-examine the defendant regarding prior convictions. State v. Carter, supra; La.R.S. 15:495. The purpose of the inquiry should be to test the credibility of the witness and not to establish a prejudicial inference of a defendant's propensity toward crime. In the present case the prosecutor seemed to be trying to establish that the prior conviction would not discourage the defendant from committing a different offense in the future. There is room for speculation as to the reason that the prosecutor pursued this line of questioning. However, the questioning occurred during cross-examination and was promptly cut off by defendant's objection. The import of the questioning was not clear enough to have had a significant effect on the jury. The questioning was not necessarily prejudicial and would not in any event warrant reversal.
*870 In a related argument the defendant reserved error number seventeen after the following colloquy during cross-examination of the defendant:
"Q. At the time you were placed on probation were the conditions of your probation read to you?
"A. Yesno they weren't read to me. I was given a paper and instructed to read them.
"Q. So you know what constitutes a violation of that probation?
"MR. KEMP: Judge, I am going to object. There has been no
"THE COURT: Overruled.
"MR. KEMP: May I say why I am objecting? There has been no probation violation. He has not been revoked. There had been no revocation hearing and his probation has not been revoked.
"THE COURT: Proceed, answer the question.
"MR. KEMP: Note our objection.
"A. Will you repeat it?
"Q. At the time you read these things did you know that such things as DWI would be a violation of the conditions of your probation?
"A. I did not know that DWI was a violation."
The defendant argues that the purpose of the inquiry was to show defendant's disregard for the law and his lack of fear of punishment, rather than to attack his credibility.
The district attorney wanted to explore the fact that the admitted cocaine felon had been driving while under the influence while on probation, a violation of probation terms. When the district attorney ventured into that area defense counsel instantly objected, but simply upon the assertion that essentially defendant had never had his probation revoked, which was true but not relevant to the issue of whether defendant in fact had violated his probation. Defense counsel also objected on the grounds that defendant had not violated his probation, which presumably was wrong in that defendant had been convicted of driving while under the influence and defendant ultimately admitted to those convictions. Defendant's precise objection here is without merit and whatever the merit of his contention here that the cross-examination went beyond the scope allowed under Jackson, supra, a defendant who admitted to a conviction for possession of cocaine with intent to distribute could hardly have been prejudiced much by telling the jury that he drove while under the influence or that he had received probation for the cocaine conviction. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 18
In assignment number eighteen defendant argues that the prosecutor, during closing argument, entreated the jury to misapply the evidence relating to prior convictions when he stated:
As far as the stolen items, that was diamond earring that were stolen. I don't really see that that has a lot to do with reasonable doubt. We didn't make a big point about the stolen items, because actually, he was not charged with it. But I would say this, would a person who possessed cocaine, a very dangerous narcotic drug, with intent to distribute, intent to distribute, you know what that means. You heard his testimony about the other, might he stop and pick up some diamond earrings and some other things? I think that he certainly mightI don't think that it makes any difference.
The stolen items referred to were pieces of jewelry taken during the instant offense and never recovered. Defense counsel had made reference to this item in his closing arguments as follows:
We get now to the question of the watch and the earrings. Mrs. Smith testified that these items were stolen by the rapist. As His Honor will charge you the law of motive is important in this connection. Under our law it is not necessary to prove a motive in order to warrant conviction. However, if no motive is proven that is a circumstance that should be considered favorably to the defendant.

*871 Now, I ask you what motive would this young man have for stealing a pair of earrings and a watch? He didn't want for anything. He lived at home, a comfortable life with his mother and little sister. He didn't have to go out and steal to get things that he needed.
Thus, the state in the argument to which the defendant objected was with good reason seeking to rebut the defense argument that defendant lacked a motive to steal the items during the offense. To the extent that the impermissible argument tended to persuade that the rapist also robbed, it is of little consequence since both the state and defense throughout the trial were willing to concede that the rapist robbed, be it the car or the jewelry. But the prosecutor here used the factor of the prior conviction to infer that this defendant as a perpetrator could well have taken the jewelry. And such use of prior convictions is impermissible for they are only admissible to impeach defendant's credibility, not to prove that defendant is a bad man who having committed a crime before is likely to have been the crime perpetrator here. State v. Ghoram, 290 So.2d 850 (La.1974).
Nonetheless, we do not find prejudice warranting reversal. Conceding the possibility that defendant's objection was valid, the only remedy defendant requested was a mistrial. Mistrial is a drastic remedy which requires a strong showing of prejudice. State v. May, 362 So.2d 516 (La.1978). The prosecutor's remarks are not so prejudicial that the trial court was required to declare a mistrial.[6] Defendant would have been entitled to a mistrial if the court had been satisfied that an admonition was not sufficient to assure the defendant a fair trial. C.Cr.P. art. 771.
If defendant had asked the judge without success to admonish the prosecutor to preclude further argument along the lines objected to and to instruct the jury that prior convictions could be considered only for the purpose of judging defendant's credibility, or, even earlier had defendant asked the judge to explain to the jury the limited purpose of defendant's prior convictions, defendant may have had a valid complaint. Considering the fact that the prosecutor discontinued argument along objectionable lines, we are not prepared to say that the submission of the prosecutor's argument standing alone required a mistrial, particularly since defendant had it within his power to obtain curative relief short of a mistrial had he sought it, an admonition from the judge. Assignment of Error Number Eighteen is without merit.

ARGUMENT NO. VIII

(Assignments of Error Nos. 15 and 16)
By assignment number fifteen defendant argues that a mistrial should have been granted when the state made reference to another crime committed by the defendant, but of which he had not been convicted. The questioning occurred during cross-examination of the defendant. The state was inquiring about prior convictions and asked the defendant regarding a driving while intoxicated offense in which defendant forfeited a cash bond. The forfeiture of a cash bond would not constitute a conviction. The defense objected later during the cross-examination *872 that the evidence had been improperly admitted, and moved for a mistrial.[7]
However, as we view the record it is not at all clear, and we assume the jury had the same reaction, that the cash bond did not relate to one of the driving while under the influence charges which in fact resulted in conviction. In that event the forfeiture would have been viewed as incidental to a properly admitted driving while under the influence conviction. Nonetheless, even if the jury appreciated the fact that the cash bond forfeiture was related to a third driving while under the influence charge which had not resulted in a conviction (defendant was questioned about two other DWI convictions), it is inconsequential in terms of prejudice where defendant is charged with a violent aggravated rape.
The defendant next argues in assignment number sixteen that the state improperly adduced evidence of a narcotics offense for which the defendant had not been convicted. The defendant does not provide reference to the record for this assignment. However, the assignment appears to involve questioning of the defendant during cross-examination regarding the facts of his prior conviction for possession of cocaine with intent to distribute. The defendant had been arrested and convicted in Jefferson Parish but during cross-examination indicated that he had sold the drug in Orleans Parish. The defendant was being properly questioned regarding the factual circumstances of his prior conviction. There does not appear to be an attempt by the state to establish any other crimes by the defendant during this questioning. References to a drug sale in Orleans Parish were made by the defendant and were apparently part of the same transactions for which he was convicted. Assignment of Error Number Sixteen lacks merit.

ARGUMENT NO. IX

(Assignment of Error No. 20)
In this assignment of error defendant claims the trial court erred in denying defendant's motion for a new trial.[8] Defendant alleges the prosecutor admitted during the motion for a new trial that he failed to disclose to the defense a statement in his possession which he knew refuted a witness' principal identifying characteristic at the trial.
On the day the rape was committed the Smiths' domestic Mrs. Griffin was questioned by the investigating officers and the tape of that interrogation was later transcribed. A portion of that interrogation went as follows:
...
Arnetta Griffin: You know, as I say, he could really fit in to the description as far as I was concerned to someone that was driving a truck.
Det. Blades: About his eyes. You remember if they were big eyes, small eyes, or medium or
Arnetta Griffin: I really didn't I didn't pay any attention, I really didn't, I didn't pay any attention to his eyes.
Sgt. Gueldner: You don't remember if they were dark or light or anything?
Arnetta Griffin: He was, he was, he was very fast looking, it wasn't, he didn't have
Sgt. Gueldner: Was he a nice looking man? Would you call him attractive or just a
Arnetta Griffin: I would consider him being just a ordinarily, nothing about him, that I would consider of being appealing of any nature whatsoever.
*873 Mrs. Griffin did not attend the lineup following defendant's arrest. Her first opportunity to view defendant occurred at trial when she was called to testify. As indicated in our discussion of assignment of error number six, the court in response to a defense request staged a lineup of sorts in court by allowing defendant to be seated in the spectator section alongside several other white males and the witness from the stand picked out defendant as the perpetrator.
Then, upon cross-examination by defense counsel she testified as follows:
Q. Would it be fair for me to say that you could be mistaken in this identification?
A. Its possible of anything but I do know he's the one, those eyes I'll never forget `em.
Q. You realize that many people have eyes that look alike
A. That's true.
Q. You realize that, do you not?
A. That's true.
Q. Am I correct in saying that you did say that you could be mistaken in this identification?
A. Its possible for anything but I'm not with this because I'll never forget those eyes. If you ever once see something too and you see it again hit do something to you.
The witness' apparent contradictory statements concerning her recollection of the perpetrator's eyes gives rise to the legal problem in this assignment.
At a hearing on the motion for a new trial based on newly discovered evidence the prosecution admitted that at the time of Griffin's trial testimony he had in his file the offense date statement (July 25, 1977) of the witness. He did not at trial upon hearing Griffin's testimony turn over that statement to defense counsel.[9]
Defense counsel had filed in advance of trial a motion for discovery which requested revelation of exculpatory information in conformity with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The prosecution was in error, the defendant argues, in failing to disclose the existence of material statements favorable to the accused relevant to identification issues, especially since the state's entire case was based upon eyewitness identification.
Brady requires the state to disclose evidence material to the guilt or punishment of the accused. The Brady rule (divulgence of exculpatory evidence) has been extended to cases in which evidence adversely affecting the credibility of an important witness is involved. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Bailey, 367 So.2d 368 (La. 1979). However, a finding above that evidence should have been disclosed prior to trial or at trial does not require the reversal of a conviction. State v. Falkins, 356 So.2d 415 (La.1978).
There is a significant practical difference in the decision of the prosecutor to disclose prior to trial and a trial judge's decision in a post-conviction hearing whether to reverse the conviction because evidence was not disclosed. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Before a trial or at trial a prosecutor should disclose evidence when he is uncertain whether it is sufficiently material to require disclosure under Brady, because the significance of an item of evidence can seldom be predicted before the entire record is completed. To unilaterally decide not to disclose is to invite the risk of error. See United States v. Hibler, 463 F.2d 455 (9 Cir. 1972). In contrast, a judge in a post-trial hearing has the entire record before him, can ascertain the materiality of the omitted evidence in the context of the entire record, and can determine from all the evidence whether the evidence was so material that its omission resulted in denying defendant his right to a fair trial.
In the present case where there was not involved clearly perjured testimony nor a *874 defense request for specific information,[10] the standard of materiality involved is whether the omitted information creates a reasonable doubt where none existed before. As this Court stated in Falkins, 356 So.2d at 418, quoting from Agurs 96 S.Ct. at 2401-2:
The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that [in a post-trial hearing by the court] if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is not justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
The questions before us in this case are therefore whether or not Arnetta Griffin's statement, not furnished the defense notwithstanding a general request, was exculpatory, and if it was, whether the state's neglect to furnish it constituted reversible error, i.e., whether the omitted evidence creates a reasonable doubt that did not otherwise exist.
To begin with the earlier statement was not necessarily exculpatory. This is not a case where an identification witness in an earlier statement admitted for instance that she had not seen the defendant, or where there is a blatant unexplainable falsehood. In the earlier statement she was asked if the perpetrator's eyes were big, small or medium and she in effect responded that "I really don't know because I didn't pay attention to his eyes." Yet later in court in the presence of the person she identified as the perpetrator and looking him in the face she was able to relate in effect "That's him. I'll never forget those eyes. If you ever see something and you see it again it does something to you."
This analysis has bearing on the degree to which this earlier statement was exculpatory or became exculpatory when defendant testified that she would never forget defendant's eyes. We can assume for Brady purposes that perhaps it was sufficiently exculpatory to warrant being divulged. Surely it would have been helpful to the defendant to have had the earlier statement and it may be conjectured to what avail defense counsel might have put the earlier statement in cross-examination. The significant question is, however, whether the prior statement when evaluated in the context of the record as a whole creates a reasonable doubt where one does not otherwise exist. We conclude that it does not. Four of the five eyewitnesses, including Arnetta Griffin, identified the defendant at trial and a fifth gave a tentative identification. Furthermore, Griffin's in-court identification was not based on any pre-trial identification procedure. Mrs. Griffin's pre-trial statement would have been helpful in impeaching the testimony. However, we do not conclude that it was so material that the Agurs standard is met here. The omission of the evidence did not deny defendant his due process right to a fair trial.
The assignment of error is without merit.

ARGUMENT NO. X

(Assignment of Error No. 21)
During the trial whereat identification was the sole factual issue in dispute there was presented evidence that two rapes had taken place in and around the Hammond area by what appeared to be a single perpetrator employing a modus operandi not entirely *875 dissimilar to what was employed in this case. The victims testified at trial that the defendant here at bar was not the perpetrator of those rapes and did not resemble the perpetrator of those crimes. Composite drawings developed by witnesses of the perpetrator were introduced into evidence and argument was had thereon as to similarities of those composites.
Following the trial and conviction defendant filed a motion for a new trial based on the newly discovered identity of the perpetrator of the other rapes. After the arrest of that person, one George Brumfield, he confessed to a number of rapes in Louisiana, Mississippi and Alabama, including several rapes in the Hammond area, but he denied raping this victim.
We remanded the case for hearing on a motion for new trial pending the appeal. That hearing was conducted and the trial judge refused to grant the motion for a new trial, concluding that the new evidence presented by defendant would not likely have produced a different result from the guilty verdict earlier reached.
The hearing consisted principally of the testimony of a private investigator hired by defense counsel. The investigator testified about his investigation which tended to prove that the other man, George Brumfield, had lied about his whereabouts and weight at the time this victim was raped, that he was checked into a motel only a few miles away from the scene of this offense the night before the rape, and that Brumfield had an automobile which was reported to the police as being near the scene of the offense. Defendant argues here that presentation of this newly discovered evidence would result in a different verdict.
We conclude that the trial judge did not abuse his discretion in denying defendant's motion for a new trial. State v. Huckaby, 368 So.2d 1059 (La.1979). The conviction was based upon four positive eyewitness identifications. The new evidence presented by defendant would perhaps have tended to support his argument that the other rapist could have been the perpetrator of this rape, but the jury had seen composite drawings of Brumfield and heard testimony by two women in the Hammond area who had been attacked by this other rapist a few months after this rape occurred. Yet the jury obviously rejected defendant's argument that he had been mistaken for this other man. While the defense would have been able to show the coincidental presence of this other rapist in the Hammond area and that Brumfield owned a car which very loosely fit the description of an auto seen in the victim's neighborhood near the time of the rape, matters not before the jury the first time, we are not prepared to say that the trial judge abused his discretion in concluding that the new material would not "probably have changed the verdict or judgment of guilty." C.Cr.P. art. 851(3),[11]State v. Kelt, 362 So.2d 751 (La.1978).
Without an assignment of error this Court cannot on appeal consider the possibility that defendant's sentence of one hundred and fifty-six and one-half years (ninety-nine years are to be served without benefit of probation, parole, or suspension of sentence) may be excessive.[12] Defendant may be able to present a valid claim that his sentence was excessive in a habeas application.
This twenty year old defendant's prior criminal record has not involved violent conduct. His only previous felony conviction was for possession of cocaine with intent *876 to distribute. In the present case defendant's criminality essentially consisted of a single violent sex crime from which defendant was charged (properly) with four offensesaggravated burglary, attempted aggravated crime against nature, attempted aggravated rape, and armed robbery.[13] Defendant molested Mrs. Smith (to put it mildly) but he did not disable or permanently harm her, however grave was the offense otherwise.
The armed robbery, which consisted of taking the victim's car keys to make his getaway, was merely incidental to the sex crime. Considering the fact that defendant received fifty years for the major crime for which he was convicted, and in view of the fact that three of four sentences were consecutive rather than concurrent it would appear that the one hundred fifty-six and one-half years for his convictions is excessive and ninety-nine years without benefit of probation, parole, or suspension of sentence for the armed robbery charge may also be excessive.
While a defendant complaining about the excessiveness of his sentence is no longer required to make a formal objection at time of sentencing to preserve post-verdict error for appellate review, State v. Cox, 369 So.2d 118 (La.1979), defendant is required to alert this Court to his objection to the sentence imposed by providing this Court with an assignment of error.[14] C.Cr.P. art. 920. Excessiveness of sentence is of course a Louisiana Constitutional issue. Article I, Section 20, Louisiana Constitution of 1974. Thus, this issue may be presented by a writ of habeas corpus if not raised on appeal.

Decree
For the foregoing reasons the conviction and sentence of defendant are affirmed.
AFFIRMED.
SUMMERS, C. J., concurs.
MARCUS, J., concurs and assigns reasons.
STONE, J. ad hoc, agrees that the conviction should be affirmed and therefore concurs, but is of the opinion the sentences are excessive and should be treated at this time.
MARCUS, Justice (concurring).
While no objection is required as to excessiveness at the time of sentence to preserve the issue for appellate review, it must be assigned as an error in order to be reviewed by this court. State v. Gist, 369 So.2d 1339 (La.1979); State v. Cox, 369 So.2d 118 (La. 1979). This requirement fully protects defendant's due process rights regarding review of the excessiveness of his sentence. Accordingly, I disagree with the statement in the majority opinion that the defendant may be able to present a valid claim that his sentence was excessive in a post-conviction habeas application. Accordingly, I respectfully concur.

ON APPLICATION FOR REHEARING
DENNIS, Justice.[*]
On application for rehearing, this factually complex case poses a single question: Does the newly discovered evidence, which tends to refute the eyewitness testimony upon which defendant was convicted, warrant a new trial? We believe that it does.
Defendant, Edmond E. Talbot, III was convicted by a jury of attempted aggravated rape, La.R.S. 14:42, attempted crime against nature, La.R.S. 14:89.1, aggravated burglary, La.R.S. 14:60, and armed robbery, *877 La.R.S. 14:64. These convictions all arose from a criminal episode which occurred on July 25, 1977. However, because Talbot had one previous felony conviction for possession of cocaine with intent to distribute in June, 1976, La.R.S. 40:967(C), he was adjudged to be an habitual offender, La. R.S. 15:529.1, and sentenced to 156½ years at hard labor. At the time of the offenses in this case Talbot was twenty years old.
There have been several hearings on the question of whether defendant is entitled to a new trial because of new and material evidence discovered since the trial.[1] At the conclusion of the hearings the trial judge denied the defendant's motion for a new trial.
We interrupted our consideration of defendant's motion for a rehearing to remand the case for a final series of hearings on the issue of a new trial. We determined that we should proceed to decide the questions raised after considering additional written and oral argument by the parties and the records of the trial and the hearings held in the trial court.
In the interest of orderly presentation, our opinion follows this outline: (1) The prosecution's evidence; (2) Weaknesses and contradictions; (3) The newly discovered evidence; (4) Trial judge's findings and decision; (5) Precepts of law applicable; (6) Application of precepts to the case; (7) Conclusion and decree.

The Prosecution's Evidence[2]
On the morning of July 25, 1977, at about 7:00 a. m., a white man wearing work clothes was seen walking through a residential subdivision in Hammond, Louisiana. He flagged down Mr. D. A. Cole, a resident on his way to work in his automobile and warned him of some children who he said were throwing rocks at vehicles at the entrance to the subdivision. His conversation with Mr. Cole in the street was observed by Mr. and Mrs. Smith who looked out their bedroom window to see why their dogs were barking.[3] As Mr. Smith left for work in his car a short while later, the pedestrian stranger stopped him, told him he was working on a house nearby, and asked whether his dogs would bite.
After Mr. Smith drove off the stranger walked up to the Smith house, knocked on the door and asked Mrs. Smith for directions to a place he said he was delivering supplies. He thanked her and left after she told him she was not familiar with the address. He returned in a few minutes, however, and asked Mrs. Arnetta Griffin, a domestic worker who had just arrived, if he could use the telephone. Shortly after the telephone was handed to him outside, the stranger pushed open the door, brandished a pistol and announced "This is a robbery." The perpetrator locked Mrs. Griffin in a bedroom closet and forced Mrs. Smith to disrobe at gunpoint. He battered the victim in an attempt to force her to engage in vaginal and oral sexual acts. When the offender's attempts to commit rape and crime against nature proved unsuccessful due to her resistance and his inability to maintain an erection, he masturbated and ejaculated on the victim. Afterwards, the *878 assailant locked the victim in the closet with Mrs. Griffin, took several items of jewelry and fled in the Smiths' automobile. He abandoned the car on a parish road a short distance from the subdivision.
Approximately five hours after these offenses, sheriff's deputies spotted the defendant Edmond Talbot as he was returning home from a trip to a veterinarian's office. The officers followed Talbot to his home and questioned him because they thought he fit the broadcasted description of Mrs. Smith's assailant. To conceal the nature of their suspicions, however, they informed him that they were investigating a car theft. In response to their inquiry, Talbot informed them that he had spent the previous night at home. A short time later deputies stopped Talbot and his sister as they were going to check on a new job Talbot had obtained. After asking him if he was familiar with a business establishment near Mrs. Smith's house, the deputies took Talbot to the police station. Still under the impression that the deputies were investigating a car theft, but convinced that the investigation was serious, Talbot corrected the information he had given the deputies by telling them that he had spent the previous night at a young woman friend's house trailer. Shortly thereafter, he was released.
A composite picture of the offender was constructed through an interview with Mrs. Smith. On August 1, 1977 Detective Dykes of the Tangipahoa Parish Sheriff's Office discovered that Talbot, who resembled the composite picture, was working at a shopping center in Hammond. The detective arranged for Mr. D. A. Cole, the neighbor whom the offender had flagged down near the Smith house, to visit the store. Before he entered the store, either on the same day or a few days earlier, Mr. Cole had been shown the composite picture and told that it represented Mrs. Smith's description of the culprit. Once inside the establishment, Mr. Cole observed and spoke briefly with the defendant. Upon rejoining the officers outside, Mr. Cole identified Talbot as the pedestrian stranger. The officers immediately arrested the defendant.
The following day the victim and her husband identified Talbot as the offender in a lineup conducted by the Sheriff's Office. A third person, Mr. Harold Gomez, who had seen a man resembling the offender near the Smiths' home shortly before the crime occurred was unable to make a positive identification at the lineup. When Gomez left the room where the lineup was conducted he told Detective Dykes that if he had had to pick someone out of the lineup, it would have been number five (defendant's number at the lineup). Mrs. Griffin and Mr. Cole were not asked to view the defendant in a police lineup.
At trial, the defendant was identified as the perpetrator of the crimes by Mrs. Smith, Mrs. Griffin, Mr. Cole and Mr. Smith. Mr. Gomez testified that Talbot resembled the man he saw but that he could not positively identify him.

Weaknesses and Contradictions
Although the evidence was sufficient to support the guilty verdicts, there were weak points in the prosecution's case. There was no physical evidence linking Talbot to the crimes, the identification testimony could be questioned on several grounds, the modus operandi fit two other offenses which Talbot definitely did not commit, Talbot's skin complexion and hair condition were markedly different from that of Mrs. Smith's assailant, and Talbot had a partially corroborated alibi for the morning of the crime.
The law enforcement officers apparently terminated their investigation after obtaining the lineup identification. They did not attempt to search Talbot's home or his automobile for physical evidence. The prosecution's case rested exclusively upon the testimony of the identification witnesses.
The prosecution witnesses' identification of Talbot as the offender at trial could have been influenced by several factors. Mrs. Smith's positive identification of him at trial followed her much more tentative selection at the lineup. Her lineup identification *879 may have been influenced more by the composite picture she constructed with a police officer than her independent recollection. Mr. D. A. Cole's courtroom identification followed his clothing store encounter, which was probably influenced greatly by his previous inspection of Mrs. Smith's composite drawing. Mr. Smith could have been swayed by his wife's lineup selection of Talbot in his presence. Mrs. Griffin's dramatic courtroom identification of Talbot as the culprit is subject to question on the grounds discussed later in connection with the newly discovered evidence.
At trial the perpetrator was described by all of the state's witnesses as having extremely light colored skin. Mrs. Griffin and Mr. and Mrs. Smith commented that the offender had a very fair complexion and that he appeared not to have worked outside in the sun. The defense, however, presented evidence which established that Talbot's skin was deeply tanned on the date of the offenses. After his spring semester at the University of Southeastern Louisiana, Talbot had been employed as a highway construction worker for several weeks immediately preceding that day. He became very darkly tanned during this period, according to the testimony of several co-workers, friends and relatives. Further, two photographs of Talbot taken at a veterinarian's office on the day of the offenses showed that his skin was deeply tanned. Also, the state's witnesses consistently stated that the assailant had oil in his hair and moustache. Numerous defense witnesses testified, however, that Talbot did not use oil in his hair.
The State presented evidence that two rapes had been committed in or around the Hammond area by an unidentified person, still at large, who employed a modus operandi very similar to that used in this case. After observing Talbot, the victims of these rapes testified that he was not the person who attacked them. Composite drawings developed in the two rape cases and those prepared in the investigation of the present case were introduced into evidence. Although the issue is subject to argument, and was contested vigorously at trial, the facial characteristics of the persons depicted in all of the drawings are similar.
Talbot took the stand in his defense and testified that on the night before the offense he spent the night with a young woman friend in her house trailer and did not leave until 9:30 the next morning. The friend testified, however, that she was unaware whether he left her trailer during the time of the offenses because they had slept in separate rooms. Nevertheless, she testified that she awakened at 8:00 or 9:00 a. m. and saw Talbot asleep in the other room. In a prior statement to police, however, she had said that she awakened at 4:00 a. m., saw Talbot there and went back to sleep. Talbot testified that he at first concealed from the deputies his whereabouts on the night before the Smith crimes because he did not want his mother to know that he slept at his girlfriend's trailer.

The Newly Discovered Evidence
The newly discovered evidence in this case emanates from several sources: George Brumfield confessed twice to police officers and once to his wife that he committed the crimes of which Talbot had been convicted. He led police officers to the crime scene where his interview with them revealed a high circumstantiality of detail. Physical evidence tending to link Brumfield with the crimes was discovered in his toolbox. Mrs. Brumfield testified that she accompanied her husband while they stopped in front of Mrs. Smith's house the night before the offenses and that he was absent from their nearby motel room the next morning during the time of the crime. Arnetta Griffin gave a pretrial statement to police that she never looked at the offender's eyes, contrary to her trial testimony. Other witnesses testified that Brumfield was registered in the motel near Mrs. Smith's house the night before the offenses and that he habitually wore oil in his hair. Evaluation of this evidence is complicated, however, by Brumfield's statements and post-trial testimony. He retracted his confessions, claiming that he and Talbot entered a scheme while they were cellmates to *880 have Brumfield take the blame for Talbot's crimes.
In August of 1978, following Talbot's conviction, Brumfield was arrested in Washington Parish in connection with a simple kidnapping which occurred in Tangipahoa Parish. Shortly thereafter, Brumfield confessed to a number of rapes in Louisiana, Mississippi and Alabama, including several rapes in the Hammond area. Two of these cases involved victims who testified that Talbot was not the person who raped them. Brumfield's modus operandi in all of these cases was strikingly similar to that of Mrs. Smith's assailant. Initially, however, Brumfield denied having committed the offenses against her. He claimed that at the time of these crimes he was not in the Hammond area and did not resemble the perpetrator because he was forty pounds heavier then.
However, a private investigator hired by defendant discovered that Brumfield was in the Hammond area at the time of the offenses in question and also that his weight was more compatible with the description of the assailant given by the victim. The investigator discovered that on the night before the offense Brumfield and his wife were registered at a motel only a few miles away from the scene of the crimes. A copy of the motel registration card showed that Brumfield checked out of the motel on the morning of the offenses at 8:22 A.M., approximately forty-five minutes after the crimes occurred. The Brumfields drove from the motel to New Orleans for a medical examination in connection with his application for overseas employment. At the examination, Brumfield's weight was recorded as 210 pounds, which roughly corresponds to the witnesses' estimates of the offender's weight. Further, the defense produced evidence establishing that Brumfield shared with Mrs. Smith's assailant a practice of wearing thick hair oil. Also, a late model automobile of the same make and color as Brumfield's car with a similar C.B. antenna, was sighted near the crime scene on the morning of the offenses.
After Brumfield confessed to the series of rapes in Louisiana, Mississippi and Alabama a search was conducted at the Washington Parish home of Mr. and Mrs. T. C. Slocum, Mrs. Brumfield's parents. Physical evidence of these crimes was discovered, including pictures and other personal property of the victims. It appeared that Brumfield had a penchant for keeping mementos of his crimes.
On August 21, 1979, George Brumfield confessed to the crimes of which Talbot had been convicted in a tape recorded statement to Tangipahoa Parish authorities. He gave a detailed account of the attempted rape and armed robbery of Mrs. Smith and described the interior arrangement of the home. He agreed to accompany sheriff's deputies to the site of the offenses. The following day, without assistance or prompting, he directed deputies from the parish jail to the victim's home and to within ten to fifteen feet of where the stolen car had been abandoned approximately one-half to three-quarters of a mile from the house. He correctly identified the windows of the bedroom and bathroom of the Smith home from the outside, and noted a new wall added to the carport since the day of the crime. Brumfield also correctly identified the houses which had been built in the neighborhood since the crimes.
Sheriff's deputies began to check out other portions of Brumfield's confession. In his confession, Brumfield said that he had put Mrs. Smith's car keys in his toolbox, and had given the victim's Bulova watch and gold ring to his wife. He stated that after his arrest he instructed his wife to dispose of the watch and ring, and that she had given the watch to her sister and had thrown the ring in the woods behind her father's home. He also admitted owning several guns, including a .32 caliber nickel plated revolver which he said he used to commit this crime. Brumfield said he had instructed his wife to get rid of these also, and she told him she had thrown the guns in a river.
On August 23, 1979, deputies contacted Washington Parish authorities and asked *881 them to search Mr. Slocum's house for Brumfield's toolbox. At the request of a deputy sent to the house, Mr. Slocum retrieved the unlocked toolbox from his son's bedroom closet and turned it over. Another deputy who opened the toolbox at the Washington Parish Courthouse, found Mrs. Smith's set of keys in the top tray of the toolbox. Further investigation revealed that the keyring contained a key which fit the Smith's automobile ignition and another key which fit the lock to an office formerly occupied by Mrs. Smith. Mrs. Smith identified the keys as hers when she testified at a hearing on the motion for a new trial.
An officer later interviewed Mrs. Brumfield's sister, who confirmed that Mrs. Brumfield had given her a watchdescribed by her as a Bulova or Timexbut that she had lost the watch. A search with a metal detector in the woods behind Mr. Slocum's residence failed to produce the ring Brumfield claimed he took from the victim. The searching officers found it was impossible to use the detector because of the presence of numerous pieces of discarded scrap metal and cans throughout that area of the woods.
On August 25, 1979, while alone in a maximum security cell in the Tangipahoa Parish Jail and scheduled the next day to be sent to the state penitentiary at Angola, Brumfield wrote a letter in which he recanted his confession to these crimes. The letter was addressed to Detective Charles Gabriel, one of the officers who had taken his tape recorded confession. In it Brumfield said he had been told all he knew about the attempted rape and armed robbery by Talbot, and that Talbot's family had offered him money to falsely confess. Sometime later that day Brumfield attempted suicide by cutting his throat with a razor. The wound was not serious, however, and after his recovery Brumfield was transferred to Angola to serve the remainder of the fifty year sentence he had received after pleading guilty to other offenses.
On January 11, 1980, Mr. Joe Simpson, an attorney at law, and Detective Travis Dykes, visited Brumfield at the state penitentiary. Mr. Simpson had formerly served as an assistant district attorney and had conducted the Talbot prosecution. After a lengthy off the record discussion, Brumfield gave them a tape recorded statement in which he denied committing the crimes of which Talbot had been convicted. In his recorded statement, Brumfield claimed that Talbot had agreed to pay him $2,500 for "taking his rap." According to Brumfield, Talbot supplied him with the details of the crimes, and arranged for the victim's keys to be planted in Brumfield's toolbox.
Later that month, Brumfield called the Chief Criminal Deputy, Captain Charles Binder and asked to talk with him about the Talbot case. On January 31, 1980, Captain Binder, accompanied by Tangipahoa Parish Sheriff Frank Edwards and Detective Charles Gabriel, interviewed Brumfield at the penitentiary. Until Brumfield informed them, the officers were unaware that Detective Dykes and Mr. Simpson had preceded them by two weeks. Without Brumfield's knowledge, Sheriff Edwards tape recorded Brumfield's statements. Brumfield at first reiterated his denial of any involvement in the Smith crimes. He contended that the keys and the Bulova watch were planted evidence. He claimed to have gained detailed knowledge of the victim's house and neighborhood when he and his wife cased the subdivision for burglaries. Brumfield said he could handle his fifty year sentence but not one as long as Talbot's. He was under the erroneous impression that Talbot had received a 285 year prison term. Brumfield indicated that Detective Dykes and Mr. Simpson led him to believe that if he were linked to Talbot's offenses that "they can lower the boom on me." After once more professing his belief that he would "get more time," Brumfield suddenly interjected "I might as well quit lying to ya'll, ya'll know I'm lying to ya'll," and proceeded to confess once more in detail to the attempted rape and armed robbery of Mrs. Smith. He explained that he recanted his first confession because of his fear of spending additional time in the penitentiary, and added that after giving the *882 first confession no one had believed him anyway.
Brumfield was called to testify at a hearing on defendant's motion for a new trial. At this time he again denied committing the Smith crimes, and repeated his claim that his original confession was part of a plot by Talbot and his family. When defense counsel confronted him with his most recent confession, Brumfield angrily denied ever making such a statementalthough the transcript of the tape recording read to him was introduced into evidence and stipulated to be accurate by the State. Brumfield testified that he made a deal with Talbot to confess to the crimes while they were in the Tangipahoa Parish jail, that he had learned details of the crimes from Talbot, and that he had written to his wife telling her how to plant the keys and watch that Talbot would send to her. According to Brumfield, he later confessed to the crimes upon receiving a letter from her indicating that the evidence had been received and planted.
Mrs. Marie Brumfield followed her husband to the stand. During a recess just before her testimony, Brumfield threatened her in the courtroom, stating, "I'm going to get you, you bitch!" Mrs. Brumfield testified that her husband, while in jail after his arrest but well before his August 21, 1979 confession to the police, had confessed to her his crimes against Mrs. Smith as well as several other rapes. She further testified that he had given her a Bulova watch in December, 1977 which she in turn had given her sister. She confirmed that Brumfield had told her to dispose of the watch right after his arrest and to throw several guns used in his crimes in the river. Although Mrs. Brumfield did not admit her involvement during the actual commission of the crimes against Mrs. Smith, she did place herself and her husband in the victim's neighborhood the night before the crimes. She said they drove through the subdivision looking at the houses and at one point stopped in front of the Smith house. She testified that she awoke the next morning around 7 a. m. in their motel room and her husband was gone. She said that he returned to the room around 8:00 a. m. and was in a hurry to check out and get to New Orleans. She stated that Brumfield was dressed in blue jeans and a long-sleeved, dark green shirt.
Mrs. Brumfield revealed that she had accompanied Captain Binder on an automobile ride through several Hammond neighborhoods in which she claimed that her husband had committed burglaries. During that ride Mrs. Brumfield pointed out the Smith's home and said that she and her husband had stopped in front of it the night before the offenses.
Captain Binder testified and confirmed that Mrs. Brumfield picked out the victim's house as the target of one of her husband's burglaries. However, Binder believed that Mrs. Brumfield had indicated she and her husband visited the neighborhood sometime before the night previous to the offenses. Detective Charles Gabriel testified that George Brumfield, during his custodial tour of the subdivision, accurately pointed out new homes in the Smith's neighborhood and the addition of a wall in the victim's carport.[4]
Captain Binder and Detective Gabriel both testified to the high degree of similarity between the modus operandi employed in the other rapes to which Brumfield had confessed and the attempted rape of the victim in this case. In each case, the perpetrator (1) wore gloves; (2) committed the crime in a residence during the day; (3) asked to use the telephone in order to gain entrance; (4) ordered the victim to the bedroom and told her to undress; (5) struck or "pistol whipped" the victim; (6) locked the victim in a closet after the attack; and (7) had difficulty maintaining an erection. The Smith offense differed only in that no car was stolen from the victims of the other rapes.
Talbot testified at a hearing on his new trial motion that he and Brumfield were *883 cellmates for four and a half months following Brumfield's arrest in August, 1978. Talbot was incarcerated in Tangipahoa Parish Prison at this time awaiting the disposition of his appeal. During this period, Talbot testified, Brumfield offered to confess to the crimes for which Talbot had been convicted in return for money with which he could obtain drugs. Talbot stated that Brumfield had exhibited suicidal tendencies and wanted the drugs in order to commit suicide. The offer was never accepted, according to Talbot; however, Brumfield did attempt to commit suicide after his wife furnished him drugs. Talbot stated that after this episode, there was no further discussion between them regarding the possibility of Brumfield confessing the crimes against Mrs. Smith.
Arnetta Griffin, the victim's domestic worker, did not attend the lineup following defendant's arrest. Her first opportunity to identify the defendant occurred at trial when she was called to testify. In response to a defense motion for special in-court identification procedures, the trial judge allowed the defendant to move to the second row of the spectators' bench and sit in a group of four individuals that he had selected from the courtroom spectators. Arnetta Griffin, who was sequestered with the other witnesses, was not brought into the courtroom until the defendant had seated himself. During direct examination by the state, however, when asked to identify the assailant, Arnetta Griffin pointed the defendant out from the other persons in the courtroom. This in-court identification was particularly damaging to the defendant. The prosecutor placed particular emphasis on the novelty and reliability of the identification procedure in his closing argument to the jury.
Upon cross-examination by defense counsel, Arnetta Griffin said she was certain of her identification of Talbot as the offender because she recognized his eyes. She testified as follows:
Q. Would it be fair for me to say that you could be mistaken in this identification?
A. Its possible of anything but I do know he's the one, those eyes I'll never forget em.
Q. You realize that many people have eyes that look alike
A. That's true.
Q. You realize that, do you not?
A. That's true.
Q. Am I correct in saying that you did say that you could be mistaken in this identification?
A. Its possible for anything but I'm not with this because I'll never forget those eyes. If you ever once see something too and you see it again hit do something to you.
At the new trial motion hearing, the prosecution admitted that at the time of Mrs. Griffin's trial testimony it had in its file a transcript of her interrogation by police officers on the date of the crime. A portion of that interrogation contained a statement inconsistent with her testimony:
Det. Blades: About his eyes. You remember if they were big eyes, small eyes, or medium or
Arnetta Griffin: I really didn't I didn't pay any attention, I really didn't, I didn't pay any attention to his eyes.
Although Griffin's extrajudicial statement that she didn't pay attention to the offender's eyes unquestionably would have impeached her trial testimony this court held on original hearing that the prosecution's failure to disclose the statement was not reversible error. Nevertheless, this piece of evidence must be reconsidered in determining whether the total body of newly discovered evidence calls for a new trial.
The defense presented additional witnesses at a new trial motion hearing to show that two sheriff's deputies provided Arnetta Griffin with information about Talbot's seating position and attire immediately prior to her dramatic in-court identification. Mrs. Mary Jo Cutrer claimed that she saw members of the local law enforcement agency point out Talbot to Mrs. Griffin through windows in the rear door of the courtroom just before she was to testify.
*884 Tests conducted by the trial court in order to ascertain the credibility of this testimony revealed that Mrs. Cutrer could not identify persons looking through the rear door windows from where she sat in the courtroom.
Former deputy Thomas Davidson testified that while he was on duty in the hall of the courtroom he overheard two other deputies tell Mrs. Griffin immediately before she entered the courtroom that Talbot was the man in the light-colored suit. After Mrs. Griffin made her in-court identification, the trial judge ordered that a photograph be made of the position Talbot selected. This photograph clearly shows that Talbot was the only man in the group of four dressed in a light-colored suit. Although the evidence is not convincing that Mrs. Griffin saw Talbot before entering the courtroom, it is possible that she was given a description of his clothing before she made her identification.
The state called witnesses to refute the alleged improper conduct by its officers. Both officers denied that they had either pointed out Talbot or described his clothing to Mrs. Griffin. The state called Mrs. Smith to the stand, who again identified Talbot as the perpetrator after seeing both Talbot and Brumfield in the courtroom. Mrs. Smith stated that the assailant did not have any tattoos on his arms; the state demonstrated that Brumfield's arms were tattooed and that Talbot's were not.

Trial Court's Decision
In denying Talbot's motion for a new trial, the trial court rendered written reasons for judgment in which it (1) completely ignored the testimony of Mrs. Brumfield; (2) failed to consider Mrs. Griffin's pre-trial statement which tended to impeach her identification testimony; (3) found that the only reasonable hypothesis permissible from the evidence was that Mrs. Smith's keys had been planted in Brumfield's toolbox; (4) found Brumfield's confessions utterly unworthy of credence because of his retractions and his opportunity to learn details about the crime from Talbot; (5) found that there was absolutely no competent evidence of official misconduct which could have influenced Mrs. Griffin's in-court identification of Talbot; (6) found significant Mrs. Smith's insistance that Talbot was the assailant and that the culprit was not tattooed even after viewing Brumfield and his arm tattooes at the new trial hearing; (7) recalled that Talbot was identified by at least three other witnesses during the trial; and (8) concluded that the new evidence would not have created a reasonable doubt in the minds of the jury.

Applicable Legal Principles
Our statutory motion for a new trial rule, La.C.Cr.P. art. 851, in pertinent part, provides:
"The court, on motion of the defendant, shall grant a new trial whenever: * * *
"(3) New and material evidence that notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty; * * *"
The newly discovered evidence ground is stated in conformity with the corresponding provision of Section 364 of the ALI Code of Criminal Procedure. The ALI language is used in order to spell out fully the requirement that the newly discovered evidence must be evidence that would probably have changed the verdict or the judgment if it had been introduced. See La.C.Cr.P. art. 851, Official Revision Comment D.
Our rule contains the four generally recognized essential requisites for the motion for a new trial based on newly discovered evidence: (1) the evidence must have been discovered since the trial; (2) failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; (3) it must be material to the issues at the trial; (4) it must be of such a nature that it would probably produce an acquittal in the event of retrial. Moore, Federal Practice, Vol. 8-A-, § 3303 at p. 3-18; Wright, Federal Practice and Procedure, Vol. 2, § 557, p. 515.
*885 Neither the appellate nor supervisory jurisdiction of the Supreme Court may be invoked to review the granting or the refusal to grant a new trial, except for error of law. However, an abuse of the trial court's discretion on the ground of newly discovered evidence has been regarded as presenting a question of lawalthough, of course, great weight must be attached to the exercise of the trial judge's discretion, which should not be disturbed on review if reasonable men could differ as to the propriety of the trial court's action. See, e.g., State v. Jackson, 253 La. 205, 217 So.2d 372 (1968); State v. Truax, 222 La. 463, 62 So.2d 643 (1952). On the other hand, the discretion vested in the trial court must be exercised in whole-hearted good faith and be guided by the statutes, not by the court's private opinion of what the statute ought to be. Where the exercise of discretion is arbitrary and not judicial, and the judgment is unjust, it will be set aside. State v. Gilmore, 332 So.2d 789 (La.1976); State v. Randolph, 275 So.2d 174 (La.1973); State v. Williams, 258 La. 251, 246 So.2d 4 (1971); State v. Gardner, 198 La. 861, 5 So.2d 132 (1941).
Moreover, the ambit of a trial court's discretion is determined by the reasons for its existence. As Judge Friendly noted in Noonan v. Cunard Steamship Co., 375 F.2d 69, 71 (2d Cir. 1967), several of the most important reasons for deferring to the trial judge's exercise of discretion are: his observation of the witnesses, his superior opportunity to get "the feel of the case," see Cone v. West Virginia Pulp & Paper Co., 320 U.S. 212, 216, 67 S.Ct. 752, 755, 91 L.Ed. 849 (1947), and the impracticability of framing a rule of decision where many disparate factors must be weighed, see Atchison, T. & S. F. Ry. v. Barrett, 246 F.2d 846 (9th Cir. 1957). On occasion, when a problem arises in a context so new and unsettled that the rule-makers do not yet know what factors should shape the result, the case may be a good one to leave to lower court discretion. See Rosenberg, Judicial Discretion of the Trial Court, Viewed from Above, 22 Syracuse L.Rev. 635, 662 (1971).
It is well settled that this court will defer to a trial court's reasonable decision in a situation calling for discretion when resolving a new trial motion. It is self-evident, however, that in situations in which discretion is inappropriate an incorrect decision is not entitled to deference. For example, a trial court has no discretion or choice to disregard statutory rules or to ignore pertinent new and material evidence in deciding a new trial motion.
Perhaps a final word about the exercise and review of discretion should be added. When an appellate court finds an "abuse" of discretion by a trial court, its use of this term is unfortunate, meaning as it does "offense; fault; a corrupt practice or custom." To describe an improper or incorrect exercise of discretion, "misuse" would seem a more appropriate word. See Aldisert, The Judicial Process, p. 759 (1976); Pearson v. Dennison, 353 F.2d 24, 28 n. 6 (9th Cir. 1965).

Application of Precepts to the Case
The scope of the trial judge's duty toward the motion for a new trial based upon the new evidence must be kept in mind. It was not for him to determine the guilt of Brumfield or the innocence of Talbot; it was not for him to weigh the new evidence as though he were a jury, determining what is true and what is false. The judge's duty was the very narrow one of ascertaining whether there was new material fit for a new jury's judgment. If so, will honest minds, capable of dealing with evidence, probably reach a different conclusion, because of the new evidence, from that of the first jury? Do the new facts raise debatable issues? Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of evidence recently discovered and not adducible by the defense at the time of the original trial? Cf. Frankfurter, The Case of Sacco and Vanzetti, p. 103 (1927).
Applying the foregoing precepts, we conclude that our trial brother fell into *886 errors of law in failing to consider all of the new and material evidence now available that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial. It was not within the trial court's discretion to disregard Mrs. Brumfield's testimony or the prior inconsistent statement of Mrs. Griffin in determining whether the new evidence would probably produce an acquittal in the event of retrial. Further, it was a misuse of discretion to exclude the physical evidence found in Brumfield's toolbox from this evaluation. The evidence clearly does not preclude a reasonable hypothesis that Brumfield placed Mrs. Smith's keys there himself. If the trial court had correctly followed the statute by weighing all of the new and material evidence against the trial record, a proper exercise of his discretion would have required him to grant a new trial.
It is clear that the testimony of the witnesses and other evidence introduced at the new trial motion hearings was material and controverted the state's evidence upon trial. Mrs. Brumfield's testimony linking her husband to the Smith crimes stands unrefuted and virtually unchallenged. She testified that Brumfield had her stop their car in front of the Smith house the night before the offenses, was gone from their motel room at the time of the crime, and confessed the crime to her. We are inclined to believe the discovery of her testimony alone warrants a new trial and find inexplicable the trial court's disregard of this significant new evidence. On first hearing, we determined that the impeachment of Mrs. Arnetta Griffin's testimony by her prior inconsistent statement, when considered as the only newly discovered evidence, would not have created a reasonable doubt in the jury's mind. Now, however, we must consider this evidence along with all of the other new evidence which has been uncovered. If, as here, the verdict is already of questionable validity, newly discovered evidence of relatively minor importance might be sufficient to create a reasonable doubt. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). Additionally, in this regard, we find arbitrary the trial court's finding that there was absolutely no competent evidence of any official misconduct which could have influenced Mrs. Griffin's in-court identification of Talbot. Neither Mrs. Cutrer nor Deputy Davidson should have been disqualified as incompetent witnesses. Perhaps Mrs. Cutrer's testimony should have been given little weight due to the courtroom experiment which tended to rebut it. But Deputy Davidson's testimony that two other deputies improperly provided Mrs. Griffin with information to assist in her identification was contradicted essentially only by the two officers he accused of misconduct and Mrs. Griffin. The prosecution's theory that Mrs. Smith's keys were planted in Brumfield's toolbox by someone acting in concert with Talbot is based on less evidence and more speculation than the defendant's hypothesis. It is undisputed evidence that the car keys taken from Mrs. Smith were discovered in Brumfield's toolbox, which was recovered from his father-in-law's house. It is pure speculation that Talbot may have secreted the keys somewhere for many months and arranged for an unknown person to plant them in the toolbox in the Slocum family's house without detection. This theory is not advanced substantially by Mrs. Brumfield's failure to notice the keys in the toolbox when she opened it to get a hammer at a time when she had no reason to recognize their significance. In view of Brumfield's oscillations, we quite agree with the trial judge that he may very well not know the difference between fact and fiction; thus, his recantations and claims that Talbot had the evidence planted do not bolster the prosecution's speculation either. However, the police officers' testimony to Brumfield's uncanny display of knowledge concerning the details of the crime, the Smith house, the neighborhood and the abandonment of the Smith car is another matter. We find it difficult to believe that Talbot possesses the ability to observe and remember most of these details, have a confederate on the outside update his knowledge, and then *887 teach all the pertinent facts to Brumfield while in jail. It is almost as incredible to suppose that Brumfield cased the Smith house the night before the crimes thoroughly enough to know many of these facts and yet did not follow through with his planned burglary. It is also significant that the prosecution has produced no evidence pointing to a particular person as Talbot's necessary outside confederate in carrying out the conspiracy; Brumfield's statements and testimony are curiously devoid of any circumstantiality of detail although he claims to have been a party to the plot.
All of the foregoing evidence, of course, must be considered in light of the undisputed facts: At the time of the Smith case, Brumfield, a veteran rapist and burglar, was actively engaged in committing sex-related robberies and burglaries in the Hammond area, using the same modus operandi which was employed against Mrs. Smith. He was in the immediate vicinity at the time of the crime, could have committed it, and had no valid alibi. The assailant of Mrs. Smith moved through the subdivision and gained entrance to her house in the manner of an experienced daytime burglar-rapist. Talbot, on the other hand, who was a twenty year old college student at the time of the crimes, had no prior record of sex offenses, burglaries or armed robberies. His only previous felony offense was possession of cocaine with intent to distribute. Unlike the assailant, Talbot was deeply tanned and had the appearance of an outdoor worker at the time of the crimes.

Conclusion and Decree
No narrow, merely technical, question is presented by a motion for a new trial. The various statements of the extent of the power and of limitations upon the right to grant new trials must yield to the fundamental test, in aid of which most rules have been formulated, that such motions ought not to be granted unless on a survey of the whole case it appears to the judicial conscience and judgment that otherwise a miscarriage of justice will result. Nor must a new trial be withheld, where in justice it is called for, because thereby encouragement will be given to improper demands for a new trial. For, courts cannot close their eyes to injustice on account of facility of abuse. See Frankfurter, The Case of Sacco and Vanzetti, p. 107 (1927).
Grave injustices, as a matter of fact, do arise even under the most civilized systems of law and despite adherence to the forms of procedure intended to safeguard against them. Perfection may not be demanded of law, but the capacity to correct errors of inevitable frailty is the work of a civilized legal mechanism. Id. p. 108.
Considering all of the new and material evidence, we conclude that it is of such a nature that it will probably produce an acquittal in the event of a retrial, despite the testimony of the state's witnesses who identified Talbot as the culprit. When considered in this light, we believe that the defendant's showing, in the interest of fairness and justice, warranted the granting of a new trial and that the trial court failed to do so through errors of law and misuse of discretion.
For the reasons assigned, the rehearing is granted, our previous decision herein is vacated, the defendant's convictions and sentences are reversed, a new trial is ordered, and the case is remanded.
REHEARING GRANTED.
ORIGINAL JUDGMENT OF THIS COURT VACATED.
CONVICTIONS AND SENTENCES REVERSED.
NEW TRIAL ORDERED.
CASE REMANDED.
NOTES
[*] Honorable Jesse N. Stone, Jr. served as Associate Justice Ad Hoc in the vacancy created by the resignation of Tate, J.
[1] Defendant received thirty years at hard labor for the aggravated burglary offense, to run concurrently with his other sentences. He was sentenced to ninety-nine years at hard labor without benefit of probation, parole or suspension of sentence for the armed robbery conviction. Defendant received fifty years at hard labor for the attempted aggravated rape offense and seven and one-half years at hard labor for the attempted aggravated crime against nature offense, both to run consecutively with his other sentences.
[2] See State v. Patton, 374 So.2d 1211 (La. 1979); Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972).

In the present case the victim and her husband did testify as to the lineup identification of defendant. Thus, if the arrest was illegal, the testimony as to the lineup could have been tainted. However, there was no objection at trial to the victim's testimony regarding her pre-trial lineup identification of defendant. In any event, the in-court identification of the victim and her husband certainly had an independent source from the illegal arrest, the commission of the offense itself.
[3] Code of Criminal Procedure, Article 921, effective on trial date and prior to amendment by Act 86 of 1979 provides:

A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right.
[4] Louisiana Code of Criminal Procedure, Article 3 provides:

Where no procedure is specifically prescribed by this Code or by statute, the court may proceed in a manner consistent with the spirit of the provisions of this Code and other applicable statutory and constitutional provisions.
[5] The record indicates that the state made an attempt to amend the answers by correspondence sent to defense counsel prior to trial. As argued by the defense to the court, the letter made no mention that defendant later changed the time to 10:00 a. m. The state argued only that the error, if that, was harmless.
[6] C.Cr.P. art. 770 enumerates the situations where an admonition is not sufficient to prevent a mistrial:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
[7] Code of Criminal Procedure, Article 770(2) provides:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
[8] Upon defendant's motion, this Court ordered a remand on December 1, 1978 for a hearing on a motion for a new trial based on newly discovered evidence. The motion was heard and denied by the trial court on March 30, 1978.
[9] Defendant did not discover the existence of the statement until many months later. It was attached to a pre-sentence report.
[10] The Supreme Court stated in Agurs at 427 U.S. 106, 96 S.Ct. 2398 that the test of materiality where specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made. See also "The Prosecutor's Duty To Disclose, From Brady to Agurs and Beyond," 69 Journal of Criminal Law and Criminology 197 (1978).
[11] C.Cr.P. art. 851(3) provides:

The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty. (emphasis provided)
[12] Undoubtably, defendant did not raise this issue at trial for tactical reasons. Defense counsel probably did not want to seem to undermine his client's assertion of innocence by focusing on the sentence imposed.
[13] This Court has stated numerous times that concurrent sentences are the usual rule when the crimes charged arise out of a single incident. See State v. Watson, 372 So.2d 1205 (La.1979); State v. Cox, 369 So.2d 118 (La. 1979); State v. Underwood, 353 So.2d 1013 (La.1977). See also American Bar Association Standards Relating to Sentencing Alternatives and Procedures, Standard 3.4 (1968).
[14] This Court must independently review death penalty cases for excessiveness. C.Cr.P. art. 905.9, State v. Cox, 369 So.2d at 121.
[*] Honorable Pike Hall, Jr. participated in this decision as Associate Justice ad hoc, in place of Associate Justice Jack C. Watson, recused.
[1] After the imposition of sentence, but prior to appeal, a hearing was conducted pursuant to a motion for a new trial, which was denied by the trial court. Talbot appealed from his convictions and sentences. Before a decision was rendered, Talbot filed a second motion for a new trial based on newly discovered evidence, and this Court remanded the case for a hearing. The trial court, after taking evidence, denied the defendant a new trial. On January 28, 1980 this Court affirmed Talbot's convictions and sentences, finding no merit in his assignments of error, including those related to the new trial motions.

Talbot applied for a rehearing in this Court. He coupled with his application a motion for remand to file a supplemental motion for a new trial based on additional newly discovered evidence. This Court granted the motion and remanded. The trial court conducted another new trial motion hearing. After considering the additional evidence adduced, however, the trial court denied Talbot's supplemental motion for a new trial.
[2] Substantial portions of the following summary are taken from the original opinion in this case written by Justice Calogero.
[3] The name of the victim and her husband have been changed.
[4] Brumfield testified at a new trial hearing that he and his wife cased several houses in the Smiths' subdivision prior to the offenses against Mrs. Smith.