555 So.2d 1335 (1990)
STATE of Louisiana
v.
Corneal KNAPPER.
No. 89-K-0841.
Supreme Court of Louisiana.
February 5, 1990.
*1336 Robert Glass, Lori R. Fregolle, Glass & Reed, New Orleans, for applicant.
William Guste, Jr., Atty. Gen., Harry F. Connick, Dist. Atty., Sandra Pettel, Jack Peebles, Kim Garvey, Asst. Dist. Attys., for respondent.
CALOGERO, Justice.
We granted writs in this case, wherein relator complains of the court of appeal's affirming his conviction and sentence for second degree murder, to determine the merit of defendant's motion for a new trial based upon newly discovered evidence. That motion was denied by the district court judge and found nonmeritorious by the court of appeal. For the reasons which follow we find that the motion has merit, reverse the rulings of the district court and court of appeal, and remand the case for retrial.
On April 11, 1986, Corneal Knapper was convicted of second degree murder in the July 10, 1985, shooting death of his one time friend, Timothy Loving. On June 16, 1986, Knapper moved for a new trial based on newly discovered evidence. The court denied the motion and then sentenced Knapper to life imprisonment without benefit of parole, probation, or suspension of sentence. Finding that the new evidence would not have produced a different verdict, the court of appeal found no error in the district court's denial of the motion for new trial and affirmed Knapper's sentence and conviction. State v. Knapper, 538 So.2d 702, 706 (La.App. 4th Cir.1989).[1]
The defendant Corneal Knapper had been acquainted with Timothy Loving since Loving was released from prison in the spring of 1984. Knapper knew Loving through Knapper's sister, Hazel Lee, who was Loving's girlfriend. Also he and Loving had been co-workers at the Louisiana World's Fair during the summer of 1984. During the summer of 1985, Knapper was living with his sister uptown in New Orleans in order to be closer to his place of employment. Loving also stayed there overnight from time to time. On Friday, July 5, 1985, Loving drove Hazel, who was going out of town, to the airport. Knapper, who was at Hazel's house, received a call from Loving asking Knapper to meet Loving downtown at Loving's parents' house. Knapper went to their address, waited for Loving to arrive, talked to Loving for awhile, and then returned to Hazel's house. When he entered the house, he noticed that it was not as he had left it and discovered that $2000 in cash which he was saving to purchase Hazel's car, was missing.[2]
The following Wednesday, July 10, Knapper had a conversation with a neighbor, Terrel Pierre, who informed Knapper that he had seen Loving enter Hazel's house with a key the previous Friday before Knapper had arrived. Since Loving was not authorized to have a key to Hazel's house, and since Loving had drawn Knapper away from the house with his request to come downtown, Knapper suspected Loving of taking his money. That Wednesday Knapper also met with his nephew Rogers Johnson who reported that he had just found Loving inside Clara Lee's house and that Clara Lee was missing some articles of jewelry and money. (Clara Lee was Johnson's grandmother and Knapper's mother.) Johnson and his girlfriend had entered Clara Lee's locked house, found Loving inside, waited for him to leave, and then reported the incident to the police. Johnson accompanied the police to Loving's parents' house in search of him, but he was not there.
Johnson and Knapper set out for the Loving residence to talk to Eula Loving *1337 who did not want charges brought against her son, and to find Loving. They each carried a gun. When they did not find Loving at his parents' house, they went to the home of Byron Snead, a close friend of Loving's, who lived in the St. Bernard Housing Project. Loving was indeed there and had been there for several hours. Also there, were Byron Snead, Snead's wife, Carrie, and Carrie's four-year-old nephew.
Accounts differ as to the events which occurred next. However, Loving, Knapper, and Johnson had a loud discussion about the thefts, in front of Snead's apartment. Knapper stood on the steps to the porch, Johnson stood on the grass in front of the apartment, and Loving stood on the front porch facing the other two. Then Loving turned away from Knapper and Johnson as if to enter the front door of the apartment. According to Knapper's account and the account of an eye witness, George Smith, after reaching the screen door, Loving pulled a gun from his waistband, turned, and fired at Johnson and Knapper. According to Snead's version, Loving had no gun on him when Johnson and Knapper shot him down.
Loving was shot nine or ten times with bullets from two different guns. He had entry wounds to his chest, back, arms, left buttock, and left hip and fell face down in the apartment doorway. Neither Knapper nor Johnson was injured, and they both ran. Then Knapper disposed of his gun in the Mississippi River.
Byron Snead, who, while serving time for armed robbery, had been a fellow inmate of Loving's at Angola State Penitentiary, initially told police that he had not witnessed the shooting. However, on July 15, Snead told police that he did witness the shooting, that Loving was unarmed, and that Knapper and Johnson had shot Loving. He explained to police that he had been afraid to come forward with the facts until after he was able to relocate his family to another neighborhood. Later, at a pre-trial hearing, Snead admitted that Loving had had a gun when he first arrived at the apartment but that Snead had made him remove the gun and leave it in an upstairs bedroom while he remained in Snead's home. Snead reported that the day after the shooting he removed Loving's gun from the upstairs bedroom and threw it into Lake Pontchartrain. He explained that as an ex-convict, he was not supposed to have a gun in his possession, and he feared being sent back to jail. Snead testified that he was on the front porch at the time of the shooting. He stated that when Knapper and Johnson began firing at Loving, he ran from the porch, jumped the fence next to his apartment, reentered the apartment from the back door, then found Loving lying inside the front doorway.
Although Snead claimed that no other adults were in the courtyard to witness the shooting or the events leading up to it, the defense offered the testimony of George Smith who stated that he was visiting friends in the St. Bernard Project on the day of the shooting and was carrying a sack of groceries en route from the grocery store to his friend's apartment when he happened to see Loving, Johnson, and Knapper outside of an apartment, holding a conversation. He was acquainted with the men and cut across the courtyard intending to greet them. Smith spoke briefly to Johnson, and, as he stood there near the porch, he became aware that they were arguing about a break-in at Johnson's grandmother's house. Smith testified that a fourth man came to the screen door and tried to get those arguing to come inside. Next Smith saw Loving move toward the door as if to go inside, pull a gun from his waist, and then whirl around shooting. Smith had noticed the imprint of a gun through Loving's shirt which imprint appeared more distinct as Loving raised his left arm to open the door. It appeared to Smith as though Loving were "trying to shoot and get into the house at the same time." He testified that Johnson and Knapper returned fire, that he ran, and that they ran toward St. Bernard Avenue.
As Smith was giving direct testimony of these events, the trial judge interrupted defense counsel and began to question Smith from the bench. The judge seemed to be cross-examining Smith on his earlier testimony that Loving had pulled a gun *1338 and fired first.[3] When Smith again stated unequivocally that Loving had fired first, the Judge declared, "I don't believe you." The defense moved for a mistrial which the judge granted. Then defense counsel decided instead to continue the trial, already in its second day, with only an admonition to the jury to disregard the comment.
Defendant Knapper's own testimony essentially paralleled Smith's. He testified that Loving had a reputation for violence and that Loving regularly carried a gun. Knapper stated that he and Johnson went looking for Loving to get back property Loving had stolen, and that they carried guns for protection because of Loving's reputation as a violent person. According to Knapper's story, he and Johnson approached Snead's apartment through the back door, went inside the apartment and upstairs where they noticed a pistol and drug paraphernalia on a dresser.[4] Loving put the pistol in his waistband as they went back downstairs. When outside on the porch their discussion became more heated, Snead came to the door and suggested that they come inside. Loving moved toward the screen door, then turned with the pistol in his right hand, and fired. According to Knapper, he and Johnson returned fire in self-defense and then ran.
The jury was apparently unimpressed with Knapper's plea of self-defense. They rejected verdicts of not guilty and guilty simply of manslaughter, and instead found Knapper guilty of second degree murder, La.R.S. 14:30.1.[5]
A short time later Knapper moved for a new trial based on newly discovered evidence. On April 23, 1986, after the trial had ended, an investigator for the defense, having followed leads down several blind alleys, finally uncovered another witness to the shooting.
At the hearing on the motion for a new trial, the newly discovered witness, Zachary Lane, testified that on July 10, 1985, the day of the shooting, he was staying with his grandmother who lived in the St. Bernard Housing Project directly across the courtyard from the Snead residence. He was upstairs when he heard an argument taking place in another apartment. At first he went downstairs to the front porch and then left the porch and went out into the courtyard to see what was going on. Lane testified that he saw Loving, Snead, Knapper, and Johnson out on the front stoop as well as another man standing near the porch. Loving walked to the screen door, opened it, then spun around with a gun and fired. After Loving fired, Knapper returned fire. Lane paid more attention *1339 to those who were arguing than to the other man standing nearby but noticed, after the shooting, that the other man was carrying groceries. Furthermore, Lane testified that after everyone had scattered, he saw Snead return to the scene, pick up the gun from the victim's body, and walk back into the house. Lane's reluctance to come forward with information earlier was explained by the fact that immediately after the incident, police, having received a tip that Lane was in the courtyard during the shooting, questioned him as a suspect and searched his grandmother's apartment. Other witnesses at the hearing were the defense investigator who testified as to how he located Lane, and several residents of the St. Bernard Housing Project who testified that they saw Lane in the courtyard on the afternoon of the shooting.
The Louisiana Code of Criminal Procedure article 851 provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
. . . . .
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty....
A defendant seeking a new trial based on newly discovered evidence must establish four elements: (1) that the new evidence was discovered after the trial; (2) that failure to discover the evidence prior to trial was not due to the defendant's lack of diligence; (3) that the evidence is material to the issues at trial; and (4) that the evidence is of such a nature that it would probably produce a different verdict in the event of a retrial. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Talbot, 408 So.2d 861 (La.1981).
On review a trial court's discretion will be given great weight; however, where the exercise of discretion is arbitrary and the judgment is unjust, it will be set aside. Talbot, 408 So.2d at 885. Furthermore, it is not for the trial judge to weigh the evidence to determine the guilt or innocence of the defendant; rather the judge must ascertain whether another jury presented with all the evidence including that recently discovered, would probably reach a different verdict. Prudholm, 446 So.2d at 735-36; Talbot, 408 So.2d at 885.
In applying the facts of the instant case, we conclude, as did the court of appeal, that the first three factors for granting a new trial based on newly discovered evidence were met. Although police may have had information that Lane was in the vicinity during the shooting since he was treated as a suspect the night of the crime, the defense investigator only discovered his whereabouts after the trial was completed and after an exhaustive search. Since Lane's eye witness account in several respects supports Knapper's testimony and that of the eye witness, Smith, and impeaches the state's only eye witness, Snead, Lane's testimony is patently material. Consequently, the only factor at issue is the fourth: whether the evidence would have probably produced a different verdict.
In State v. Shannon, 388 So.2d 731 (La. 1980), this court ruled that the defendant was entitled to a new trial based on newly discovered evidence. In that case the new evidence consisted of testimony by an eye witness who saw the shooting at issue, which contradicted the testimony of the state's witnesses and corroborated the testimony of the defense witnesses. We concluded that, considering the new evidence in the light of all other evidence presented at trial, the jury would have produced a different verdict. Also, in State v. Dimm, 153 La. 95, 95 So. 414 (1923), this court determined that the defendant was entitled to a new trial because the jury, were they presented with newly discovered eye witness testimony that the victim had a gun, would probably find, in light of other evidence *1340 presented at trial, that the defendant acted in self-defense.[6] Similarly, in the instant case, we conclude that the new evidence would have produced a different verdict and that the trial court should have granted a new trial.
The trial court denied Knapper's motion for a new trial without giving reasons, and the court of appeal affirmed. The appellate court concluded that due to several inconsistencies,[7] Lane's testimony would not have resulted in a different verdict. We find, however, that the newly discovered evidence is crucial to Knapper's case and that such minimal inconsistencies as Lane's testimony presented,[8] do not undermine his otherwise potent testimony. He corroborates other defense testimony and fortifies the defense contentions regarding discrepancies in the state's case. Lane's testimony not only provides support for other defense witnesses and bolsters Knapper's plea of self-defense, but it also undermines the testimony of the state's eye witness whose credibility had already been impeached.
Lane's testimony that Loving had a gun in his possession and was the first to open fire corroborated the testimony of Knapper and Smith who reported the same. Since the jury would have expected Knapper to color events in his own behalf, and, since Smith's testimony had been discredited by the trial judge himself, Lane's testimony would be an essential element in convincing the jury that Knapper indeed fired in self-defense. Also, Lane's testimony rehabilitates Smith as a witness after Smith's veracity had been called into question by the judge. Smith had testified that he had a brief conversation with Johnson as he stood near the porch and also that he carried groceries; similarly, Lane testified that the other man stood near the porch, spoke to Johnson, and carried groceries. That Smith was the other man whom Lane saw at the scene of the shooting seems to be a reasonable conclusion. Lane's account also fills in the gap in time after the shooting about which only Snead testified at trial. Lane's account, that Snead returned to the scene after the shooting and removed the gun from Loving's person, offers an explanation for the fact that no gun was found in Loving's possession although Knapper and Smith reported seeing him with a gun.
Just as Lane's testimony served to strengthen the testimony of Knapper and Smith, so it served to weaken Snead's testimony which, due to Snead's background, reputation, and own inconsistencies, by comparison, appears much less reliable. Snead was a twice convicted felon who, according to his former supervisor, had lost his most recent job after being suspected of stealing. He was also known in the neighborhood to be dealing in drugs. He denied being Loving's close friend although several other witnesses including his own wife, Carrie, testified that they were very close. He gave three differing accounts of his involvement with the shooting, and one of his prior inconsistent statements was under oath. Even his final testimony was *1341 contradicted in many details by his own wife as well as by defense witnesses. Furthermore, Lane's testimony further calls into question Snead's veracity since Snead reported that Loving had no gun at the time of the shooting and that no other adults were present in the courtyard. Since Snead was the state's only eye witness, this additional testimony by a disinterested witness severely undermines the state's case.
It is difficult to predict with certainty that Corneal Knapper would probably have been acquitted had the jury heard Lane's testimony in conjunction with all of the other evidence at trial. However, it is not at all difficult, and we do indeed conclude, that the jury, weighing the eye witness testimony of the felon Snead with that of Knapper, Smith, and Lane, none of whom had prior criminal convictions,[9] would have been persuaded by Knapper's version of the facts and convicted him of no more than manslaughter, as was Johnson's fate. Since we conclude that a jury, having the benefit of Lane's testimony, probably would be swayed to reach a different verdict, we determine that Knapper is entitled to a new trial. Furthermore, to deny Knapper the benefit of a trial which includes Lane's critical testimony would be an injustice.

DECREE
For the foregoing reasons the judgment of the court of appeal affirming defendant's second degree murder conviction is reversed and the case is remanded to the district court for retrial.
CONVICTION REVERSED; CASE REMANDED TO DISTRICT COURT.
NOTES
[1] Knapper's sole assignment of error was the district court's denial of his motion for a new trial.
[2] Thomas Loving, Timothy Loving's father, testified that Knapper told him that $2000 worth of cocaine was missing from the apartment, but other witnesses testified that Knapper told them that it was money that was missing.
[3] The transcript of this testimony is as follows:

BY DEFENSE COUNSEL:
Q. And what were his actions when he pulled the gun?
A. Trying to shoot Mr. Roger and Mr. Corneal Knapper.
BY THE COURT:
Now, what do you mean by trying to shoot?
BY THE WITNESS:
Huh?
BY THE COURT:
Did he fire the gun?
BY THE WITNESS:
I don't know whatwhathe must to have fired first because
BY THE COURT:
No, no, no, no, did you see him fire the gun?
BY THE WITNESS:
Well, Your Honor, when the guy pulled out the gun I went to getting out the way.
BY THE COURT:
Answer me yes or no, did he fire the gun? Did you see him fire the gun?
BY THE WITNESS:
As far as my point of view.
BY THE COURT:
Yes or no?
BY THE WITNESS:
Yes, Your Honor.
BY THE COURT:
You did see him fire the gun?
BY THE WITNESS:
Yes, Your Honor.
BY THE COURT:
I don't believe you.
[4] An analytical toxicologist employed by the coroner's office testified that her analysis of Loving's blood and urine revealed that Loving had consumed a substantial amount of cocaine within six hours of his death, but the exact time could not be pinpointed. Snead disavowed any knowledge of Loving's taking drugs.
[5] Rogers Johnson, Knapper's confederate, was later apprehended and convicted of manslaughter in connection with the shooting death of Loving. His conviction and sentence were affirmed. State v. Johnson, 525 So.2d 745 (La. App. 4th Cir.1988).
[6] For other cases in which this court has found merit in motions for new trials based on newly discovered evidence, see State v. Brooks, 386 So.2d 1348 (La.1980); State v. Williams, 258 La. 251, 246 So.2d 4 (1971); State v. Gardner, 198 La. 861, 5 So.2d 132 (1942); and State v. Day, 148 La. 815, 88 So. 76 (1921).
[7] For example, the appellate court noted various factors which, it concluded, weakened Lane's credibility: Lane told police the night of the shooting that he was not a witness; and Lane knew before trial that defense counsel was looking for him but did not come forward until after the trial. To the contrary, however, these assertions are simply not borne out by the record. First, the record does not reveal that Lane made a prior inconsistent statement to police. Lane admitted under cross-examination that he did not volunteer information about the shooting to the police; nowhere does the record suggest that "Lane told the police ... that he did not witness the shooting" or that he "denied any knowledge of the shooting when questioned by the police." See Knapper, 538 So.2d at 704, 705. Similarly, from the record, it is impossible to say whether Lane knew of efforts to locate him before the April trial or that he delayed in contacting the investigator once he was aware of those efforts.
[8] The only part of Lane's testimony which seemed to be in doubt had to do with his testimony concerning the time frame of events after the shooting as compared with the testimony of another witness who saw Lane at the other end of the courtyard after the shooting.
[9] Knapper and Smith testified and were vigorously cross-examined at trial, and Lane testified and was cross-examined at the hearing on the motion for a new trial. Since none of these three testifying witnesses were impeached with a prior criminal conviction, we conclude that they probably had none. In all events, the jury was not apprised of any prior convictions of the three.