591 So.2d 1219 (1991)
STATE of Louisiana
v.
Tyronne SMITH and Troy Wilkerson.
No. 90-KA-1236.
Court of Appeal of Louisiana, Fourth Circuit.
December 11, 1991.
Rehearing Denied February 12, 1992.
*1220 Harry F. Connick, Dist. Atty. and Jack Peebles, Asst. Dist. Atty., New Orleans, for the State.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for defendant, Tyronne Smith.
Owen A. Neff, Sessions & Fishman, New Orleans, for defendant, Troy Wilkerson.
Before KLEES, BYRNES, and PLOTKIN, JJ.
PLOTKIN, Judge.
Appellants Tyronne Smith and Troy Wilkerson were indicted for the second-degree murder of Jerry Lee. Smith and Wilkerson pled not guilty. A jury found both guilty of murder as charged. They were sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. We reverse and remand for a new trial.

FACTS:
Sometime before 4:00 a.m. on March 27, 1988, police officers patrolling in the Desire Housing Project were told by Aaron Holmes that a dead body was lying in a driveway in the Project. Holmes directed the officers to the body of Jerry Lee, lying in a driveway in the 3300 block of Desire Street. Around Lee's body, the officers found a matchbox, two $1 bills, and a clear plastic baggy containing white powder. A rock of crack cocaine was also found in his clothing. No weapons were recovered on or near the body. An autopsy of Lee revealed he had at least five gunshot wounds to the back and head, two of which were the fatal shots. An analysis of his bodily fluids proved negative for alcohol, barbituates, or benzodiazipams, but positive for cocaine and its derivatives.
Although the police could find no witnesses to the shooting that day, a couple of weeks later the defendants Tyronne Smith and Troy Wilkerson became suspects. The police eventually contacted Thornton Smith (apparently no relation to Tyronne), who admitted he had been with Lee just prior to the shooting and who identified Tyronne and Troy as the killers. Because Thornton knew both defendants, he was able to positively identify them from photographic lineups. Approximately a month after the killing, Tyronne was arrested at the scene of the shooting. Troy was arrested in the same area a few days later.
Thornton Smith testified that he saw Lee with Troy and Tyronne earlier the night of the shooting, when Lee had planned to go with the defendants to the St. Thomas Project. He testified that just prior to the shooting, Lee came to his apartment, which was located near the murder scene, and asked him to come out into the driveway. Thornton's apartment was located no more than fifty yards from the driveway, and was accessed through a "gap" in the buildings. Thornton testified that he walked toward the driveway and was less than 30 feet from Lee when he noticed the defendants were also nearby. Thornton testified he thought something was not right, and he told Lee he was going home. Thornton testified that Lee began walking toward the defendants and that he started walking back home when the defendants shot Lee. Thornton testified that he heard the shots, ran into the hallway of his building, heard more shots, ran back outside, and saw the defendants running away with guns in their hands. Thornton testified that both *1221 defendants were armed and both shot Lee. He admitted he then went back into his house and did not tell the police what he had seen until officers contacted him some weeks later. He also admitted that he had a prior conviction for auto burglary and that he had been addicted to heroin in the past, but he maintained that he had conquered his habit through a drug rehabilitation program at DePaul's. He testified that Lee was known to sell "bunk," counterfeit drugs. He also described the clothes worn by the defendants that night as being casual clothes.
Thornton testified that another man, Peter Williams, was also present at the shooting, but Williams did not shoot Lee, nor did he run away with the defendants. He denied seeing either Aaron Holmes or David Williams on the scene at the time of the shooting. Thornton admitted that at a pretrial hearing he had testified that only Tyronne had a gun, but he contended that he so testified because a man in the courtroom was threatening him by making motions like he was going to shoot him in the head and he thought that the man was related to Troy. He insisted that fear for his life caused him to testify that Troy did not have a gun. Thornton also admitted that at the pretrial hearing he testified that he had seen the shooting from his back step, but he stated that by "back step" he meant the area around his back porch, including the area he testified he was in when he saw the murder. Thornton admitted that he testified before the Grand Jury that he did not see the first two shots, but rather that he saw the last two shots. However, at trial he insisted that he saw the first two shots. He also admitted that he was visited a few days before trial by counsel for both defendants and by Tyronne's brother. He admitted saying that he did not want innocent men to go to jail, but he denied telling them that he was not sure who killed Lee.
David Williams testified that the knew the defendants, Lee, and Thornton Smith. He testified that just prior to Lee's murder he saw the defendants at a bar called "Champs", and that both defendants were dressed up. He testified that when he left the bar, both defendants were still there. He testified that as he was walking through the Project he heard some shots, looked through a "gap," and saw a slim man firing more shots and then running. He testified that neither defendant was the man he saw. He testified that he saw the man run down the driveway and get into a white car which sped from the scene. Williams testified that he then went to the body, and he was approached by a few people, including Thornton Smith, who asked him what had happened. He testified that it was common knowledge that Thornton used drugs at that time. He also testified that he knew Lee sold "bunk" because Lee had tried to sell it to him. Williams admitted having prior convictions for simple battery, which had been reduced from an attempted murder charge, and for possession of cocaine. He also admitted that he did not tell the police or the State what he had seen.
Aaron Holmes testified that he also knew the defendants, Lee, and Thornton Smith. He testified that he was coming down the steps of a building in the Project when he heard shots. He testified that he saw a man he did not recognize come running through the "gap" with a gun in his hand. The man ran to a white car which sped from the scene. Holmes testified that neither defendant was the man he saw running. He testified that he saw police officers in another part of the Project and told them where the body was. He admitted, however, that he told the police he did not see the shooting. He insisted that he lied because he did not want to get involved in the case. He testified that he did not see Thornton Smith there that night. He also testified that Thornton had a reputation for taking drugs at that time and for selling "bunk." Holmes admitted having a prior conviction for simple burglary.
Ben Smith, Tyronne's brother, testified that on the day before the murder he and the defendants had attended a wedding, and after the reception at approximately midnight they went to Champs, which was at the edge of the Project. He testified that he left the defendants at the bar only *1222 to walk a woman home. He testified that as they were walking through the Project, he saw Holmes who told him that a man had just been shot in a driveway. Ben testified that he walked the woman home, and when he went back to the bar the defendants were still there.
Ben testified that he went with both defense counsel to Thornton's house the week before trial, and Thornton told them that he did not want two innocent men to go to jail and that he was not sure who had shot Lee. Ben testified that Thornton told them the police forced him to make a statement identifying the defendants as the killers. He testified that he knew Thornton still used drugs because he was with him the Thursday night before trial when Thornton was using drugs, but he refused to say where he and Thornton were at the time, other than to identify the place as a hallway. He denied, however, that he used drugs. In response to defense counsel's questioning, Ben testified that the last time he saw Thornton was when Thornton was being arrested on the Friday morning before trial.
A review of the record for errors patent reveals there are none.
Smith asserts five assignments of error. Because we find assignment of error number 2 meritorious, we pretermit formal ruling on the other assignments. The assignments are as follows:
1. The trial court erred in denying a motion for mistrial when a witness testified that he had testified inconsistently at a prior motion hearing because he believed that the relatives of an appellant were threatening him.
2. The trial court erred in granting the State's motion in limine concerning the arrest of a witness, and in not granting a new trial when it was revealed that the prosecution did not disclose its favors to the witness in connection with this arrest.
3. The trial court erred in denying a motion for new trial when it was disclosed that the State had suppressed impeachment evidence.
4. The trial court erred in denying a mistrial when the prosecutor accused defense counsel of staging testimony.
5. The trial court erred in its definition of reasonable doubt.
In his second assignment of error, appellant Smith contends the trial court erred by granting the State's motion in limine barring any defense questioning about the arrest of Thornton Smith a few days prior to trial, and in not granting a motion for new trial when it was revealed that the State did not disclose its favors to the witness in connection with this arrest.
After the jury had been chosen, the State filed a motion in limine seeking to prohibit the defense from asking any questions about Thornton Smith's arrest a few days before trial, including where he had spent the intervening nights. The following then occurred:
BY MR. MERRITT:
The question is what arrangements did you make for the release on that burglary that you are on, and tell them "none", and see if they believe that, Your Honor. That's the
BY THE COURT:
When was he arrested?
BY MR. WILLIAMS:
Friday afternoon.
BY MR. MERRITT:
They just found out about it.
BY THE COURT:
He testified prior to that?
BY MR. WILLIAMS:
Yes, sir.
BY THE COURT:
He testified in a motion hearing here also, didn't he?
BY MR. WILLIAMS:
Yes, sir.
The defense renewed its objection, with one counsel noting: "What's the reward for testifying, Your Honor? Is this another reward to him?" Thornton Smith was then brought into chambers, sworn, and questioned. When asked if he had been arrested since last testifying, Thornton replied that he had been arrested for not appearing in court. The prosecutor reminded the *1223 court that a material witness bond had been placed on him earlier and then had been nolle prossed. Thornton then admitted he recently had been arrested for simple burglary. The court asked him if the State had offered to nolle prosse the case or had promised him anything, and he continued to reply that the prosecutor merely told him to tell the truth and told him that the State could not help him in those arrests. The court then allowed the defense to examine him, as follows:.
BY MR. MERRITT:
Yes. You were talking to Mr. Williams maybe an hour ago at your jail, right?
BY THE WITNESS:
Yes, sir.
BY MR. MERRITT:
Mr. Williams told you to do what he said to do, isn't that true?
BY THE WITNESS:
He said to just tell the truth.
BY MR. MERRITT:
He said to do what I told you to do?
BY THE WITNESS:
No, he just said to tell the truth.
BY MR. MERRITT:
Did he also say, "I'll have you out of here soon"?
BY THE WITNESS:
No.
BY MR. MERRITT:
You deny he said that? You are saying he said nothing like that? Well, what did he say?
BY THE WITNESS:
First we talked and he said is [sic] he cannot because I'm on this crime"I cannot fix this for you." That's when were first talked.
BY MR. MERRITT:
Then, after you first talked, what did he say?
BY THE WITNESS:
That's what he saidhe cannot fix this for me. I have to go to court.
Thornton was excused, and the court granted the motion, threatening to hold any party in contempt if he mentioned the arrest or Thornton's staying in prison. Both defense counsel noted objections to this ruling.
After trial, appellant Tyronne Smith filed a motion for new trial wherein his counsel alleged that an unknown party heard the prosecutor talking with Thornton in the holding cell just prior to trial, and the prosecutor was overheard saying, "Just do what I tell you to do and you will be released." The motion also alleges that the defense attorney (Merritt) was told by another judge of the Criminal District Court that the prosecutor asked him to grant Thornton an ROR bond. The motion stated that this judge told him that the prosecutor told him that the charges against Thornton (aggravated and simple burglary) had been instituted by a brother of one of the defendants and that the charges were unfounded. The prosecutor also told the judge that Thornton had testified for the State and should be given some consideration. The judge issued the ROR bond. The motion also noted that in addition to obtaining the ROR bond, the State also refused the charges on July 18, 1989, the day the defendants were convicted. The motion stated that these facts were not learned until July 20, 1989.
The defense introduced the incident reports from Thornton's two burglary arrests (both occurring on the Friday before trial), as well as the prosecution's screening memorandum on these two charges, recommending that they be refused. The trial court denied the motion for a new trial.
This assignment requires analysis of two issues.
1. Can the arrest record of a witness be admitted to attack credibility?
2. Were the defendants entitled to a new trial?

ADMISSIBILITY OF THE WITNESS' ARREST:
The Code of Evidence prohibits the admission of evidence regarding the arrest, indictment, or prosecution of a witness to attack the credibility of a witness. Art. 609 addresses itself only to "[a]ttacking credibility by evidence of conviction of a *1224 crime in civil cases." Art. 609.1, entitled: "Attacking credibility by evidence of conviction of crime in criminal cases," contains the following provision:
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
The Author's Notes to this subpart of art. 609.1, found in the Handbook on Louisiana Evidence Law, Pugh, Force, Rault, and Triche (1991) state in part, as follows: "Paragraph B's use of the word `generally' presumably acknowledges the possible use of arrests, indictments and the like where independently relevant to show bias." See Official Comment (d) to Article 609. The Official Comment (d) to art. 609 notes: "Paragraph F is not intended to change the prior jurisprudence to the effect that evidence of arrest, indictment or prosecution may be admitted if it has relevance independent of the suggestion that the witness is unworthy of belief, as, for example, when independently relevant to show bias." Indeed, C.E. art. 607 D(1) provides: "Except as otherwise provided by legislation: (1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness."
No Louisiana cases interpret these articles of the Code of Evidence relating to the arrest of a witness. However, a number of pre-code cases interpreted LSA-R.S. 15:495 and LSA-R.S. 15:492, the predecessors of La.C.E. arts. 609.1 B and 607 D(1).
LSA-R.S. 15:495 prohibited the use of evidence of an arrest to impeach a witness. However, LSA-R.S. 15:492 provided: "When the purpose is to show that in the special case on trial the witness is biased, has an interest, or has been corrupted, it is competent to question him as to any particular fact showing or tending to show such bias, interest or corruption, and unless he distinctly admits such fact, any other witness may be examined to establish the same." Any such questioning, however, must show that the prejudice is personal against the defendant, not just general in nature. State v. Williams, 445 So.2d 1171 (La.1984).
In State v. Sweeney, 443 So.2d 522 (La. 1983), the State sought to show the bias of the defense witness by questioning him about a prior arrest where he was apprehended by officers who were State witnesses in the case. The Court noted that the State's questions concerning this arrest did not fall within the prohibition of LSA-R.S. 15:495 because they were designed to show the prejudice of the witness and as such were admissible under LSA-R.S. 15:492.
Likewise, in State v. Rankin, 465 So.2d 679 (La.1985), the defense sought to elicit testimony concerning an alleged plea bargain agreement, wherein the State's witness agreed to testify against the defendant in exchange for the reduction of a pending charge against him from a felony to a misdemeanor. The Court noted: "The possibility that the prosecution may have leverage over a witness due to that witness' pending criminal charges is recognized as a valid area of cross-examination." Id. at 681. The defendant's conviction was upheld because, even though the trial court sustained all of the State's objections to the defendant's questions, the defense attorney was able to persist in his interrogation until the witness testified that no bargain had been made. The Court further held that although the defense should have been allowed to question the witness' attorney about the plea bargain, such failure to do so was harmless in light of the defendant's own testimony concerning the offense.
In State v. Firstley, 503 So.2d 568 (La. App. 4th Cir.1987), the defense sought to cross-examine a State's witness about a pending, unrelated charge against the witness. Prior to the State's objection to these questions, the witness testified that no deal was made. Out of the jury's presence, defense counsel questioned the witness, and he denied the existence of any deals. On appeal of his conviction, the defendant argued that he should have been *1225 allowed to question the witness further before the jury about any deal made by the State in connection with these charges. This court disagreed, finding that the questioning outside the jury's presence gave the defense the opportunity to discover if a deal had been struck, and the testimony of the witness showed there was no deal.
We hold that admission of evidence of a prior arrest is limited to special circumstances. When the purpose is to show that the witness has bias or prejudice against a defendant or party to the litigation, the witness may be examined on the issue to establish the bias, prejudice, corruption or interest. This includes evidence of the existence of any agreement or deal with the State whereby the witness receives any benefit or gain in exchange for the testimony given.
However, because of the potential prejudice to the witness and adverse parties, this issue should be raised in a motion in limine outside the presence of the jury. The trial court shall conduct a hearing outside of the jury's presence to determine the admissibility of the evidence.
In the instant case, the trial court acted correctly. The State filed a motion in limine, and the defense was given an opportunity, outside of the presence of the jury, to discover if Thornton received any consideration from the State in exchange for his testimony. After the questioning, there was no evidence that a deal or agreement had been made. Therefore, the trial court did not err in granting the State's motion in limine.
DID THE STATE HAVE AN UNDISCLOSED AGREEMENT WITH THE WITNESS ENTITLING DEFENDANTS TO A NEW TRIAL?
Smith contends that the State withheld evidence and misled the trial court at the motion in limine hearing, because a deal had been made with Thornton in exchange for Thornton's testimony. He claims that he is entitled to a new trial because of the suppressed evidence.
Prior to trial the defense filed a Motion for Bill of Particulars and Motion for Discovery and Inspection, wherein he requested a copy of the rap sheet of all State's witnesses and also "any exculpatory evidence or evidence favorable to the defense." The State's response to the first request was "Not entitled," and to the second the State answered: "None known at this time." Just prior to the opening statements, the State sought and was granted a motion in limine prohibiting the defense from asking Thornton about his recent arrest. As noted earlier, after hearing Thornton's testimony at the hearing on this motion, the court did not err in granting this motion, given the information before it.
Although the motion was filed by Wilkerson, it would also be attributable to Smith. See State v. Lavigne, 412 So.2d 993 (La. 1982); State v. Bergeron, 371 So.2d 1309 (La.1979) (on rehearing).
The record does not indicate that any testimony was taken at the new trial hearing. However, post trial events demonstrate that an agreement probably existed between Thorton and the State in exchange for his testimony. Thornton was in jail at the time of trial, charged with simple burglary and was released on his personal recognizance immediately after trial. The prosecutor also refused all charges against him the same day. Thornton's testimony before the grand jury was different from that given at the suppression hearing, which also differed from that given at trial. It is evident from his trial testimony that he was at first an unwilling witness, and that he was imprisoned because he was a material witness to the crime. He was in jail when he testified at the suppression hearing. ADA Williams visited Thornton in the holding cell just prior to trial.
Appellant cites State v. Bailey, 367 So.2d 368 (La.1979), where the State failed to disclose impeachment evidence against the State's only witness concerning any deals he may have made with the State concerning his arrest on a separate charge the day before trial. Prior to trial, the defense had filed a motion for discovery which requested *1226 the record of arrests and convictions of any of the State's witnesses or any evidence adversely affecting the credibility of its witnesses. In addition to failing to apprise the defense of the arrest of the witness, the State also failed to tell him that it had arranged for the release of the witness without bail pending the trial, and then did not seek to have the witness jailed until some days after trial when some other party complained to a magistrate. The defendant was convicted, and when he learned of these facts, he filed a motion for new trial contending that his Brady rights had been violated. The trial court denied the motion, and the defendant appealed.
On appeal, the Court reversed the defendant's conviction and sentence, granting him a new trial. The Court cited Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) for the general rule that the State's failure to disclose to the defense material evidence which is favorable to the defense justifies the granting of a new trial. The Court also cited Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), which extended Brady to evidence that would damage the credibility of State's witnesses. Quoting from Giglio, the Court noted:
When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule.... Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.
Bailey, at 370. The Court then quoted from United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976):
"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance must be sufficient to create a reasonable doubt."
Bailey at 370-371. The Court found that the defendant "could very probably have negated, to a considerable extent, the credibility of this important state witness" which would have created a reasonable doubt if he had been aware of the evidence which the State withheld from the Court.
A similar situation arose in State v. Brady, 381 So.2d 819 (La.1980), where the victim was the only State's witness. The defense sought to question the victim concerning any deals the State may have made concerning a charge pending against him. The trial court refused to allow such questioning. On appeal, the Court reversed the defendant's conviction and remanded for a new trial. The Court noted:
The right to cross-examine witnesses concerning their interest in a case is not only a statutory right, it is a right protected by the Sixth Amendment to the United States Constitution and Article I, Section 16 of the Louisiana Constitution. The United States Supreme Court stated in Pointer v. Texas, 380 U.S. 400, 13 L.Ed.2d 923, 85 S.Ct. 1065 (1965) that the right of cross-examination is included in the right of an accused to confront witnesses against him. See also Davis v. Alaska, 415 U.S. 308, 39 L.Ed.2d 347, 94 S.Ct. 1105 (1974); Douglas v. Alabama, 380 U.S. 415, 13 L.Ed.2d 934, 85 S.Ct. 1074 (1965). The Louisiana Constitution explicitly guarantees defendants the right of cross-examination: "An accused is entitled to confront and cross-examine the witnesses against him...." Louisiana Constitution, Article I, Section 16. Under both constitutions the exposure of a witness' motivation in testifying is a proper right of cross-examination. See, United States v. Davis, 415 U.S. at 316, 94 S.Ct. at 1110; Greene v. McElroy, 360 U.S. 474, 496, 3 L.Ed.2d 1377, 79 S.Ct. 1400[ ] (1959).
*1227 Brady at 822. The Court held that the trial court's limitation on his impeachment of the victim "was prejudicial to the substantial rights of the accused, both his statutory right to impeach a witness' credibility by showing bias or interest and his constitutional right to cross-examine a witness against him. LSA-R.S. 15:492, United States Constitution, Article I, Section 16. C.Cr.P. art. 921." Id. at 822.
We find that the appellants were deprived of their right to cross-examine Thornton about his arrest, which violated the defendant's constitutional right to confrontation. The questions concerning the credibility of the State's only eye witness to the crime may have created a reasonable doubt if the jury had known the circumstances of his arrest, notwithstanding the issue of whether the State made a deal in exchange for his testimony, which if true, is also a proper subject for cross-examination. The jury was entitled to know whether the State and the witness entered into an agreement in exchange for the testimony given by Thornton Smith. It was reversible error to exclude this evidence.
Two final points must be addressed. Generally, a defendant claiming a new trial should be granted based upon a claim of newly-discovered evidence must show the following things: (1) that the evidence was discovered after trial; (2) that the failure to discover it prior to trial was not due to any lack of diligence; (3) that the evidence is material to the issue; and (4) that it is probable that the evidence would produce a different verdict if the jury had heard it. State v. Knapper, 555 So.2d 1335 (La. 1990); State v. Prudholm, 446 So.2d 729 (La.1984).
In Bailey, supra, the court held that a violation of the accused's constitutional right to confrontation mandates a new trial. In the instant case, the record clearly indicates that the above criteria were met by the appellant.
Although both appellants filed motions for new trial, this ground was only contained in Smith's motion. However, under the rule established in State v. Lavigne, 412 So.2d 993 (La.1982) and State v. Bergeron, 371 So.2d 1309 (La.1979) (on rehearing), written motions made by one codefendant are presumed to apply to all defendants "unless the contrary appears."
We conclude that appellants Wilkerson and Smith are both entitled to a new trial.
Because we are remanding the case for a new trial, we note that the trial court erred in admitting the evidence that Wilkerson or someone connected to him threatened Thornton Smith.
During his testimony, Thornton admitted that during a pretrial hearing, he had testified that only Tyronne had a gun and that Troy did not have one. When the prosecutor asked Thornton why he had said only one man had a gun, the defense objected, contending the State was seeking to impeach its own witness and suggesting the jury be so instructed. The court "noted" the defendants' objections for the record, and the State was allowed to proceed. The following then occurred:
Q. When you testified before in the motion hearing, did you say both of the men had guns?
A. No, ah ah.
Q. Why not?
A. Because when I was on the stand they were doing like this (indicating) to me.
Q. Who was?
A. I don't see the dude right now, but it was a dude up in here.
Q. Who was he with? Did you know that person?
A. It looked like it was related to Troy.
The motion made by the man in the room was apparently some motion implying that Thornton would be shot in the head. The defense objected and moved for a mistrial, and a conference was held in the judge's chambers. The defense argued that such testimony was improper evidence of another crime, intimidation of a witness, and that no pretrial hearing had been held on that issue. In particular, counsel for Smith argued that his client was extremely prejudiced because if such intimidation had occurred, his client was not a party to it. The prosecutor argued that a mistrial was *1228 not mandated because the conduct had not been committed by either defendant. The court then denied the motion for mistrial.
Evidence of an attempt to influence witnesses or fabricate evidence is admissible despite its prejudicial effect when a proper foundation is laid to show "some evidence to connect the accused therewith or to show that the attempt by a third person was made with the authorization of the accused." State v. Graves, 301 So.2d 864, 866 (La.1974). In Graves, the Court reasoned that evidence of an attempt by the defendant's wife to obtain false alibi witness testimony was permissible to show consciousness of guilt on the part of the defendant.
In State v. Williams, 497 So.2d 1376 (La.1986), the victim's mother testified that the defendant's brother asked if she would consider dropping the charges against the defendant if stolen merchandise was recovered. The defendant's brother testified that he acted entirely on his own, without any knowledge of his brother's guilt or any authorization from his brother, when contacting the victim's mother. On review, the Court determined that the victim's mother's testimony was improperly allowed under the guidelines established in Graves because there was no foundation laid for its admissibility.
Here, no foundation tying the actions of the unknown man to Wilkerson was laid, other than Thornton's testimony that "[i]t looked like it was related to Troy." No evidence to show that Wilkerson caused this man to make the gesture or that Wilkerson even knew that the gesture was made was presented. Thus, the testimony was improperly admitted.
However, if the State, on retrial, can lay the proper foundation for its admissibility outside of the jury's presence, to justify the witness' inconsistency, it may be admissible, prior to cross-examination.
The record reflects that the prosecutor and defense attorney were engaged in intense and relentless trial combat. Both were held in contempt of court for their trial misconduct and comments. We pretermit ruling of the mistrial motions relating to counsel conduct and alleged improper remarks during trial. We caution both counsel that, in a case of this seriousness, obedience to the cannons of ethics and professional responsibility are expected.
We also pretermit ruling on assignments of error concerning the jury instructions regarding reasonable doubt. See Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). At retrial, this legal issue will in all probability have been resolved.
Accordingly, the convictions and sentences of Tyronne Smith and Troy Wilkerson are reversed and vacated. The case is remanded to the trial court for a new trial consistent with this opinion.
REVERSED AND REMANDED.