I iMURRAY, Judge.
Christopher White, was indicted for second degree murder. He was found guilty as charged on February 15, 1996, after a two day jury trial, and sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. This appeal followed. Mr. White’s appointed counsel filed a brief assigning one error, and Mr. White filed a pro se brief assigning an additional error.

FACTS:

On the night of December 13, 1994, Frederick Durand and Kim West planned to spend the evening together. They left Ms. West’s home around 10:00 p.m. and went to a grocery store to purchase beer. Ms. White also purchased $70.00 worth of crack cocaine on the corner of Galvez and St. Ann Streets, near the grocery store. They then went to the Rainbow Hotel on St. Ann and Prieur Streets, where they rented a room, in which they smoked crack, drank beer and were sexually intimate. They stayed at the hotel until 12:30 a.m. when they leftj¿the hotel and went to get something to eat. They went to a barbecue restaurant on Elysian Fields and Claiborne Avenue, but discovered that it was closed. They then went to Roosevelt’s on the comer of St. Phillip and Claiborne Avenue. Ms. West went into the restaurant to order food while Mr. Durand stayed in the vehicle. Ms. West saw Christopher White (who she knew as “G-money”) playing video poker in the restaurant when she placed her order. After she placed her order, Ms. West walked around the restaurant for a short time and then went outside to cheek on Mr. Durand. She saw that Christopher White was sitting in Mr. Durand’s truck in the passenger seat. Mr. Durand was seated behind the wheel. Ms. West testified that Mr. White told her to get in the truck. She did as he ordered. Once she was in the truck, she saw that he had a gun. Mr. White told Mr. Durand that the check he gave him was bad and that he wanted his $75.00 or his “shit.” He also told Mr. Durand, “You don’t believe I’ll shoot you.” After he said this several times he raised the gun and shot Mr. Durand in the head. He then told Ms. West to open the truck door, pushed her to the ground, pointed the gun at her, and ran off. Ms. West ran into Roosevelt’s and asked someone to call an ambulance and the police. She then returned to the truck and stayed with Mr. Durand until the police arrived. She testified that she was devastated by what had happened.
*1022 Ms. West gave the police a statement at the scene, but testified that she was so upset that she was not sure what she had said. After she had been taken to the Homicide Office and allowed to calm down, she gave the officers a formal statement in which she named “G-money” as the man who had shot Mr. Durand. Following which, she was shown two photographic lineups. However, Ms. West made no identification. Christopher White’s photograph was not among those 13shown to Ms. White at that time. Six days after the shooting, Ms. West identified the Mr. White as the man who shot Fred Durand from another photographic lineup. She admitted prior convictions for prostitution, crime against nature and loitering. She testified that she had been a prostitute for ten years, but, that she had gotten her life together after Mr. Durand was killed. She testified that Mr. White was a drug dealer from whom she previously had purchased drugs.
New Orleans Police Officer David Adams testified that he responded to a call of a burglary at the corner of North Robertson and St. Phillip Streets on the night of December 14,1994. As he was about to exit his vehicle, someone ran up to him and informed him that a shooting had just taken place at the comer of St. Phillip and Claiborne Avenue. When he arrived at the scene, he observed a white male, who appeared to have a gunshot wound to the head, seated behind the steering wheel of a tmck. A black female was seated next to him. He testified that there were no weapons by either the victim or the female, nor were any found in the tmck or outside. Officer Adams called in the incident and asked for an emergency medical unit. When other police units arrived, homicide and the crime lab were called out. Officer Adams and the other officers secured the scene for homicide and the crime lab. There were two witnesses to the shooting: the woman in the track with the victim and another woman. Once the scene was secured, Officer Adams returned to the burglary call.
Officer Luther Randall of the New Orleans Police Department Crime Lab testified that he was dispatched to the crime scene. The officer took photographs of the crime scene and collected evidence. He found a bloodstained napkin, a blood-stained beer can and some latent prints in the tmck, as well as some partial prints from the exterior and interior sides of the passenger door. A black purse |4and black wallet were also retrieved from the scene. A .380 caliber shell casing was later found in the track when it was being cleaned.
Detective Richard Leblanc handled the murder investigation. He testified that when he arrived on the scene, he was informed that there were two witnesses, Kim West, who was hysterical and crying, and Latesha Vinette. He took short statements from each of the witnesses at the scene, and neither was able to identify the gunman. Officer Leblanc took Kim West to the Homicide Office to allow her to calm down and to take a formal statement from her after she had done so. He did not take Ms. Vinette to the office at that time because she had informed him that she had to make arrangements for her small children, who were at home with a sitter. She gave the detective an address and asked that she be allowed to come in later. After Ms. West had calmed down the officer took a formal statement from her in which she stated that “G-Money” had killed Fred Durand. Detective Leblanc prepared two photographic lineups, which included photos of two suspects who were also known as “G-Money.” Ms. West did not identify the gunman from those lineups. Mr. White’s picture was not included in either of the two lineups. When Detective Leblanc attempted to locate Ms. Vinette for a formal statement he discovered that the address she had given him was a vacant apartment. Other efforts by the police to locate her proved unsuccessful.
Vanessa White, Christopher White’s sister, testified that her brother arrived at her house between 1:00 and 1:30 a.m. on the morning of December 14, 1994. He told her that he thought he had just killed someone sitting in a track on St. Phillip Street. He stated that he had “clocked [the victim] in the head.” Mr. White took a black gun with a clip from his pants. Later that morning, Ms. White found the gun under her sofa *1023 cushion and moved it to the top of a Mtchen cabinet |sso that her son could not get to it. When she returned home from work on December 15, 1994, the gun was not where she had put it. She did not know who may have taken it. Ms. White testified that her brother and her fiance, Ronnie Lewis, had a dispute over Ronnie’s refusing to drive Mr. White in his car. He brother threatened to “click” Mr. Lewis. When Ms. White asked her brother what that meant, he told her that she knew what it meant. Ms. White interpreted this to be a threat by her brother to kill Mr. Lewis, and she decided to contact the police. On December 20, 1994, she went to the police station and gave a statement implicating her brother in the murder of a man in a truck on St. Philip St in the early morning hours of December 14. On cross-examination she testified that she usually did not read the newspaper, and she had not seen an article about the shooting.
After reviewing Ms. White’s statement, Detective Marco Demma prepared a photographic lineup which included Christopher White’s photograph. Kim West picked Mr. White’s picture from the lineup and positively identified him as the person who killed Mr. Durand. Detective Demma then obtained an arrest warrant for the Christopher and a search warrant for his residence. The arrest and search occurred on December 21, 1994. As a result of the search, the officers located four types of ammunition (.380 caliber, 9 millimeter, .25 caliber automatic, and .38 caliber) and a black vinyl gun holster for an automatic weapon.
Dr. Alvaro Hunt, a pathologist with the Orleans Parish Coroner’s Office, who performed the autopsy on Frederick Durand, on December 15, 1994, testified that the victim died from a single gunshot wound to the head. Dr. Hunt stated that the bullet produced an extensive pattern of fracturing to the skull. There also was an extensive amount of black soot that stained the muscle just beneath the skull and | 6the outside of the skull, which indicated that the weapon was close to the victim’s head when fired.
Sheila Thomas, Mr. White’s girlfriend, testified that he was home with her until about 10:00 p.m. on the evening of December 13, 1994. Mr. White had been sick all week with a cold and stayed home, but she admitted that he left the house on occasion during that time. Ms. Thomas stated Mr. White’s nickname was “G-Man” not “G-Money,” and acknowledged that he was a drug dealer and that he had at least one gun in 1994.
Hugh Robertson, who owned H & P Barbecue Masters, located on the comer of Elysian Fields and North Robertson, which was the restaurant where Mr. Durand and Ms. West went before going to Roosevelt’s, was called as a witness for the defense. He testified that his restaurant’s hours were from 11:00 a.m. to 2:00 a.m. on Tuesdays through Saturday and 3:00 p.m. to 12:00 a.m. on Sundays, so that it should have been opened when Ms. West said it was closed. Mr. Robertson acknowledged, however, that he would close the restaurant early when the weather was bad or if he ran out of food, but he could not say with certainty whether the restaurant was closed at 1:00 a.m. on December 14,1994.
Christopher White, who testified in his own defense, stated that his nickname is “G— Man” not “G-Money.” He testified that he went to Roosevelt’s every day, and that on the evening of December 13,1994, he went to Roosevelt’s but left at approximately 10:00 p.m. He had been sick with a cold, and had been exaggerating how bad he felt in order to gain sympathy from Sheila Thomas, his girlfriend. He also testified that Ms. Thomas was home from work when he left for Roosevelt’s on the 13th, and should have known that he had left the house. Mr. White admitted he was a drug dealer, and testified that he began selling drugs |7when he was fourteen years. He stated he knew Kim West, who had purchased drugs from him. He also testified that he did not learn of the shooting until December 14, when he went to Roosevelt’s. He denied telling his sister that he shot someone, and insisted that what he had told her was that someone had implicated his name in a shooting. He admitted that he paid his sister’s fiance, Ronnie Lewis, to drive him various places, including Roosevelt’s, and that he and Mr. Lewis had an argument in which he threatened Mr. Lewis. He insisted that this was a threat to *1024 fight, not to kill, Mr. Lewis. He testified that he had bought several guns for protection, but that he had gotten rid of them after he moved to a “safer” neighborhood. Finally, Mr. White denied having ever shot anyone, and specifically denied having killed Frederick Durand.

DISCUSSION AND RECOMMENDATION

A. Errors Patent
A review of the record for errors patent reveals one. The minute entry and docket master entry for March 18, 1996 (the date of the denial of motion for new trial and sentencing) does not reflect that the defendant waived his right to a twenty-four hour delay between the denial of his motion for new trial and his sentencing as required by La.Code Crim. Proc. art. 873. In State v. Augustine, 555 So.2d 1331 (La.1990), the Louisiana Supreme Court held that failure to waive the twenty-four hour delay voided the defendant’s sentence if the defendant attacks his sentence, even though he fails to specifically allege this failure as an error on appeal. This Court has held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991). Accordingly, | gin the present case where no error is raised as to the defendant’s sentence, the failure of the trial court to observe the delay period is harmless error.
B. Assignments of Error No.l and No.2
In his first assignment of error, the defendant contends that the trial court erred in limiting the defendant’s cross-examination of Ms. West, an eyewitness to the alleged murder. The defendant argues the trial court should have permitted him to question Kim West about an attachment, which concerned a municipal violation, that allegedly was outstanding on December 14, 1995. The trial court sustained the state’s objections when the defense attempted to question Ms. West on whether she currently had an outstanding attachment. The defense then asked Ms. West if there was any discussion concerning her release the night of December 14, 1995. Ms. West replied that she could not remember any such discussion. The trial court sustained the state’s objection when the defense attempted to question Ms. West more particularly on the release issue. The trial court likewise sustained the state’s objection when the defense attempted to elicit similar information from Detective Leblanc.
The trial court then conducted a hearing outside the presence of the jury, during which defense counsel questioned Detective Leblanc about his knowledge of an outstanding attachment on Ms. West on December 14, 1995. Detective Leblanc denied having a discussion with Ms. West concerning an attachment on December 14, 1995. The detective testified that he did not know of the existence of the attachment on December 14, 1995, and that he did not check the computer on that night. Defense counsel informed the court that he had a witness who would testify that it was known on December 14, 1995, that Ms. West had an outstanding attachment. The trial court then allowed defense counsel to question | gDetective Leblanc about this before the jury. Detective Leblanc told the jury that he did not know of the attachment at the time Ms. West made her statement, but that he may have checked her record later in the investigation. The defense did not recall Ms. West to question her on this issue, but it did call Officer Frank Oliver, Sr., a former New Orleans police officer.
Officer Oliver testified that he was a police officer on December 13, 1994. He and his partner responded to the call about a shooting at St. Phillip and Claiborne Avenue at approximately 12:40 a.m. on December 14, 1994. He testified that when they arrived at the scene they saw a track parked on Claiborne with two people in it: a black female, who was crying and hysterical, in the passenger’s seat; and a white male, who had blood ■running from his head, in the driver’s seat. Officer Oliver recognized the female, whom he knew from the area. He took Ms. West from the track and placed her in back of his police unit, where he tried to calm her down. The officer took initial statements from Ms. West and Latesha Vinette. Ms. West originally stated that the gunman was a black male, who was 25 — 30 years of age and weighed about 210 pounds. She did not give *1025 a name to Officer Oliver at that time. The officer later transported Ms. West to the Homicide office. He testified that he was not involved in the questioning of Ms. West, but he heard a detective comment that there was an attachment for her at some point when the detectives came back into the Homicide Office. Officer Oliver did not know which detective made the statement. He also testified that there was no discussion about the attachment.
The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.” U.S. Const. Amend VI. Moreover, the Louisiana Constitution lipdirectly affords the accused the right “to confront and cross-examine the witnesses against him.” La. Const. Art. 1, See. 16. Nevertheless, the right to cross-examine a witness is limited by the evidentiary rules embodied in the Code of Evidence.
La.Code Evid. article 609.1 provides in pertinent part:
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
However, La.Code Evid. article 607(D)(1) states that “[e]xcept as otherwise provided by legislation: extrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.” This court in State v. Smith, 591 So.2d 1219, 1225 (La.App. 4th Cir.1991), writ denied, 604 So.2d 995 (La.1992), concluded that article 609.1 allows the admission of a prior arrest in special circumstances:
When the purpose is to show that the witness has bias or prejudice against a defendant or party to the litigation, the witness may be examined on the issue to establish the bias, prejudice, corruption or interest. This includes evidence of the existence of any agreement or deal with the State whereby the witness receives any benefit or gain in exchange for the testimony given ... However, because of the potential prejudice to the witness and adverse parties, this issue should be raised in a motion in limine outside the presence of the jury. The trial court shall conduct a hearing outside of the jury’s presence to determine the admissibility of the evidence.
In the case at bar, the trial court conducted a hearing outside the presence of the jury after defense counsel attempted to question Kim West and Detective Leblanc concerning the alleged attachment. Ms. White denied any discussion about the alleged attachment, and Detective Leblanc testified that he did not have | nany knowledge of an attachment for Ms. West on December 14, 1995. The jury was allowed to hear Officer Oliver’s testimony to the effect that some unknown detective knew, on the morning of the killing, that there was an attachment for Ms. West, but denied hearing any discussion beyond that simple comment. There was no evidence of any deal or agreement between the state and Ms. West, and no evidence that Ms. West had a bias or interest in making a statement naming Mr. White as the person who shot Mr. Durand. The trial court did not err in restricting the defendant’s cross-examination of Ms. West and Detective LeBlanc.
C. Pro Se Assignment of Error No.l[1]
Mr. White contends, in his pro se brief, that the trial court failed to instruct the jury that there were any possible lesser responsive verdicts to the charge of second degree murder.
In Louisiana, the accused is statutorily entitled to have the trial court instruct the jury as to the law on the charged offense and
*1026 on any responsive offenses. La.Code Crim. Proc. articles 803, 814, 815; State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), cert. denied, Elaire v. Blackburn, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). In the case at bar, the defendant was charged with second degree murder. Article 814 provides an exclusive list of responsive verdicts to that charge, the only responsive verdicts to second degree murder are guilty, guilty of manslaughter, and not guilty. The trial court was required only to instruct the jury on those three responsive verdicts.
li2Mr. White’s failure to object to the jury instructions generally would preclude appellate review of this alleged error. La. Code Crim. Proc. art. 841. However, State v. Williamson, 389 So.2d 1328 (La.1980), the Louisiana Supreme Court reviewed the defendant’s assignment of error concerning improper jury instructions, despite his failure to object to the instructions at trial. The court noted that “the asserted error involved the very definition of the crime of which defendant was in fact convicted. Such an error is of such importance and significance as to violate fundamental requirements of due process.” Id. at 1331. The court held that it could consider the trial court’s alleged failure to instruct the jury properly on the elements of attempted first degree murder and attempted second degree murder where the record bore full and sufficient proof of error which no posterior hearing could augment. Id. Because error alleged by Mr. White, like the error alleged in Williamson, involves the definition of the crime for which he was convicted and full and sufficient proof will be evident from the record, we will consider this alleged error on appeal.
Our review of the trial court’s instructions to the jury in this case shows that those instructions included the only possible verdicts to a charge of second degree murder: guilty; guilty of manslaughter; not guilty. The record shows that the court explicitly and clearly explained what constituted manslaughter. The court’s instructions, contrary to Mr. White’s assertions, were not erroneous in this regard.
For the foregoing reasons, Christopher White’s conviction and sentence are affirmed.
AFFIRMED.

. The defendant’s pro se brief was received after the case had been placed on the May 1997 docket. In response to the defendant’s assignment concerning the jury instructions given by the trial court, Central Staff is attempting to obtain a transcript of the jury instructions. At the present time, the court reporter has provided us only with a certificate which indicates that defendant did not object to the jury instructions provided to the jury.